LEXSEE 2005 DEL. SUPER. LEXIS 413

**ROHN INDUSTRIES, INC., Plaintiffs, v. PLATINUM EQUITY LLC, and PFRANK, LLC, Defendants.**

C.A. No. 03C-04-134SCD

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2005 Del. Super. LEXIS 413*

August 26, 2005, Submitted
November 22, 2005, Decided

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Judgment entered by *Rohn Indus. v. Platinum Equity LLC*, 2005 Del. Super. LEXIS 418 (Del. Super. Ct., Nov. 22, 2005)

**PRIOR HISTORY:** Decision After Non-Jury Trial.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff seller and defendant buyer entered into an asset purchase agreement whereby defendant guarantor was to acquire most of the seller's assets. Pursuant to section 8.1 of the contract allowing it to terminate that agreement if it believed in good faith that the transaction could result in material asbestos liability, the buyer did so. The seller then sued, and this matter followed.

**OVERVIEW:** The issue presented in the instant action was whether the buyer properly terminated the contract under Section 8.1(c)(iii)(B)(2), a provision which allowed them to do so in good faith. After analyzing the buyer's actions, the court found that the buyer's decision to terminate was made in good faith. Analysis of asbestos liability required expertise and the buyer acted appropriately in seeking counsel who appeared to have that expertise, providing him with the best available information. The legal advice that was provided to the buyer, though objectively unreasonable, caused it to doubt the application of the Bankruptcy Reform Act of 1994 to the channeling injunction and to attach unwarranted significance to the financial status of the asbestos disease claims trust. That advice, and the insistence from one of its general counsel that without the protection of the 1994 Act there was a risk of successor liability, gave the buyer a basis in law to terminate the agreement. Further, when it was discovered that the trust had a moratorium in place, and that its financial condition appeared precarious, the buyer had a basis in fact for the decision to terminate the agreement.

**OUTCOME:** Judgment was entered in favor of the buyer.

**LexisNexis(R) Headnotes**

*Contracts Law > Breach > Causes of Action*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN1] New York law provides that the plaintiff in a breach of contract suit bears the initial burden of showing that a valid contract existed and that the defendant terminated the agreement. The burden then shifts to the defendant to prove that it had good cause to terminate. The same standard exists for breach of guaranty.

*Contracts Law > Performance > Discharges & Terminations*
[HN2] Under New York law, a reasonable basis in law and in fact for terminating a contract is a legal position that is substantially justified. "Substantially justified" means more than merely undeserving of sanctions for frivolousness. Such a position must be justified to a degree that could satisfy a reasonable person.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN3] In contract law, good faith requires that a decision not be made arbitrarily or irrationally.

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Discharge*
*Civil Procedure > Injunctions*
[HN4] Under 11 U.S.C.S. § 524(g), a court entering an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction to supplement the injunctive effect of a discharge under this section. 11 U.S.C.S. § 524(g)(1)(A) (1994). The subsection expressly authorizes a channeling injunction with respect to any claim that is to be paid in whole or in part by a trust. It limits further proceedings involving the injunction to the district court in which such injunction was entered and it expressly protects transferees of any assets. Under 11 U.S.C.S. § 524(h), a grandfathering provision, the benefits provided in 11 U.S.C.S. § 524(g) apply to channeling injunctions issued before the date of the enactment of the Bankruptcy Reform Act of 1994 if various conditions are met.

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation*
[HN5] See 11 U.S.C.S. § 524(h)(1)(A).

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation*
[HN6] Under 11 U.S.C.S. § 1129(a) (1994), various requirements must be met in order for a court to confirm a plan. Subpart (a)(8) requires that with respect to each class of claims or interests, the class must accept the plan or not be impaired by the plan. The subpart under 11 U.S.C.S. § 1129(b) provides that if all the requirements of (a) are met except (8), in other words, if it is a contested plan, then the court shall confirm the plan notwithstanding the requirements of such paragraph (8) if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under or has not accepted, the plan. If the plan fails to satisfy 11 U.S.C.S. 1129(a)(8), then 11 U.S.C.S. § 1129(b) is invoked. That subsection is satisfied when all classes accept a plan.

*Governments > Legislation > Interpretation*
[HN7] When a statute is ambiguous, it is appropriate to look at the legislative history.

*Mergers & Acquisitions Law > General Business Considerations > Successor Liabilities*
[HN8] It is a well-settled rule of corporate law that where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor. Four generally recognized exceptions qualify this principle of successor nonliability. The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company.

*Civil Procedure > Preclusion & Effect of Judgments > Res Judicata*
[HN9] The doctrine of res judicata is not a mere matter of technical practice or procedure but a rule of fundamental and substantial justice. Res judicata requires a showing that there has been: (1) a final judgment on the merits in a prior lawsuit involving (2) the same claim and (3) the same parties or their privies.

**COUNSEL:** John L. Reed, Esquire, John H. Newcomer, Jr., Esquire, and Matt Neiderman, Esquire Duane Morris LLP, Wilmington, Delaware, and Maria Cilenti, Esquire, and John Dellaportas, Esquire, Duane Morris LLP, New York, New York, attorneys for the plaintiffs.

Peter J. Walsh, Jr., Esquire, and Sarah E. DiLuzio, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware, and Kevin S. Reed, Esquire, and Kevin Janus, Esquire, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York New York, attorneys for the defendants.

**JUDGES:** Del Pesco, Judge.

**OPINIONBY:** Del Pesco

**OPINION:** Del Pesco, J.

### MEMORANDUM OPINION

Platinum entered into a contract for the sale of assets. Defendant terminated the agreement in reliance on a provision which permitted defendant to terminate if it *"determines in good faith that there is a reasonable basis in law and in fact"* to conclude that the transaction could result in material asbestos liability. The Court's factual finding that there was no reasonable basis in law and in fact for the termination does not result in liability [*2] for the defendant because the decision to terminate was not arbitrary or capricious, but made in good faith based on faulty legal advice.

### Facts

On November 27, 2002, Rohn and Platinum entered into an Asset Purchase Agreement (the "Agreement"), whereby Pfrank LLC (a wholly-owned entity of Platinum

Equity LLC) was to acquire most of Rohn's assets, with Platinum Equity LLC serving as guarantor. For simplicity, this opinion refers to purchasers as Platinum. Platinum is in the business of buying and selling companies. It is accustomed to conducting purchases under expedited circumstances. When Platinum became interested in Rohn and commenced its due diligence, it learned that there was corporate history related to asbestos. It asked that a specific termination clause be put into the contract. Rohn agreed, as it was confident that no risk was associated with the language proffered by Platinum. The provision says:

> "If [Platinum] *determines in good faith that there is a reasonable basis in law and in fact* to conclude that . . . as a result of the consummation of the [Rohn transaction, Platinum] could reasonably be anticipated to have any . . . material liability for [*3] any asbestos-related claim . . . [the contract could be terminated]. n1 (emphasis supplied)

n1 Article VIII, Events of Termination, provides that the agreement may be terminated and the transaction abandoned by Buyer, "provided that Buyer or Guarantor is not in material breach of this Agreement, . . . (iii) on or prior to 8:00 p.m. New York time on December 11, 2002, if Buyer determines in good faith that there is a reasonable basis in law and in fact to conclude that . . . (B) as a result of the consummation of the transactions contemplated hereby, Buyer or any Affiliate of Buyer could reasonably be anticipated to have any . . . (2) material liability for any asbestos-related claim arising from any activity prior to the completion of Sellers' bankruptcy proceedings;" Joint Trial Ex. ("JTX") 59 at 44-45, Rohn Indus. Inc., Pfrank LLC, Platinum Equity LLC: Asset Purchase Agreement (Nov. 27, 2002).

Rohn's assets were related to the manufacture of cellphone towers and associated products. None of the assets [*4] were associated with asbestos. At an earlier time, Rohn had been a division of UNR, a successor to Unarco Industries, Inc., which, prior to 1970, made products with asbestos. In 1982, as a result of asbestos liabilities, UNR filed for bankruptcy in the Northern District of Illinois (the "Bankruptcy Court"). A legal representative was appointed to represent future asbestos claimants. The plan of reorganization (the "UNR Plan") was approved by all classes, including the representative appointed to represent future asbestos claimants. On June 2, 1989, the Bankruptcy Court confirmed the UNR Plan and UNR emerged from bankruptcy. n2 UNR issued 29.4 million shares of stock to the UNR Asbestos-Disease Claims Trust (the "UNR Trust") to discharge all asbestos claims, expressly including future claims, which were thereafter channeled to the UNR Trust. n3

n2 The Consolidated Plan of Reorganization dated March 14, 1989 contains the following definition: Asbestos-Disease Claims

> All alleged liabilities or obligations (under any theory of law, equity or admiralty) for death, personal injury, personal damages or punitive damages (whether physical, emotional or otherwise), whether or not included in the definition of "claim" in § 101(4) of the Code, arising out of exposure to asbestos, and arising from acts or omissions by one or more of the Debtors of the Debtors' predecessors In interest prior to the Effective Date, **regardless of when the sickness, injury or disease which gives rise to such liability or obligation, becomes or will become manifest**, Including, without limitation, all warranty, guarantee, indemnification or contribution liabilities or obligations of any of the Debtors to any other Entity to the extent that such warranties, guarantees, indemnifications or contribution responsibilities to such Entity cover claims against such Entity that would, if such claims had been made directly against any of the Debtors, constitute Asbestos-Disease Claims. (emphasis supplied)

Pl. Trial Ex. ("PLX") 22 at 23, *in re UNR Indus., Inc.*, Consolidated Plan of Reorganization (Bankr. N.D.Ill. March 14, 1989).

[*5]

n3 The channeling injunction provides, inter alia:

[Factual findings]

* * *

F. Moreover, the Court has examined the provisions of the Plan with respect to the treatment of Asbestos-Disease Claims, including the claims of persons who have not yet manifested an asbestos-related disease ("future claimants") and has determined that the Plan makes adequate provision for those claims.

* * *

NOW, THEREFORE, THE COURT FURTHER FINDS AS FOLLOWS;

1. In the absence of the Injunction, the reorganized Debtor, New UNR, might face limitless litigation for Asbestos-Disease Claims.

2. Adequate provision has been made pursuant to the Plan for the treatment of Asbestos-Disease Claims

* * *

5. In the absence of the Injunction, New UNR would be unable to conduct or continue in its business.

6. While New UNR would be irreparably harmed in absence of the Injunction, Asbestos-Disease Claimants, who would be enjoined, will have the right to pursue their claims against the UNR Asbestos-Disease Claims Trust established pursuant to the Plan.

7. Absent a successful reorganization, Debtors' assets would be liquidated and distributed only to existing creditors pursuant to Chapter 7 of the Bankruptcy Code. Under these circumstances, post-confirmation claimants would have rights, if any, only against corporate shells.

* * *

16. Due process is fully preserved. No property rights are impaired. Rather, federal law imposes a limitation or channeling of the direction for resolution of such claims, if any, as might be recognized under state law in the future. This is well within the power and rights of bankruptcy jurisdiction. (citation omitted).

* * *

For the foregoing reasons, it is hereby ordered that:

All Entities are permanently restrained and enjoined from taking any action whatsoever for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests, Asbestos-Disease Claims. . . . against the Debtors, any Property of the Estates of the Debtors, any of the Debtors' Affiliates, New UNR, any of its property, any of its Affiliates and any of the insurance carriers or brokers in the Insurance Litigation, including, without limitation, Bituminous Casualty Corporation.

JTX 36 at 2-6, *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr. N.D.Ill. June 1, 1989).

[*6]

The critical components of the bankruptcy proceeding were the appointment of a representative to protect

the interests of future claimants, and a specific factual finding that future claims were claims under *section 101 of the Bankruptcy Code*.

The UNR Plan was ultimately appealed to the 7th Circuit Court of Appeals by employees whose future claims in excess of workers compensation were channeled to the UNR Trust. The 7th Circuit decision, written by Judge Easterbrook, found that "what is at stake on this appeal is nothing less than the vitality of the plan of reorganization itself." n4 The court notes that a plan of reorganization is to be disturbed only for compelling reasons. n5 The opinion then tackles the argument that "treating as creditors" persons whose injuries from UNR's products are not yet manifest violates not only the Bankruptcy Code but also the Constitution." n6 The court concluded that the plan, which addressed the claims of future claimants, was not beyond the power of the Bankruptcy Court, nor was it unconstitutional.

> [Appellants] say that treating as "creditors" persons whose injuries from UNR's products are not yet manifest violates [*7] not only the Bankruptcy Code but also the Constitution. The constitutional claim is mysterious. Injuries attributable to past acts are certain to occur; although the identity of the victims remains to be ascertained, the existence of the injury is real enough . . . The plan or reorganization provides that future claims will be satisfied out of one pile of assets (the Trust) rather than another (New UNR); apportioning claims among assets is a traditional function of bankruptcy adjudication. Principles of tort law, and of corporate reorganizations, do the same, without protest on constitutional grounds.
>
> * * *
>
> As for the contention that the statute does not contemplate such a step: *11 U.S.C. § 101(5)(A)* defines as a "claim" every "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The definition is capacious, to say the least. Attaching labels such as "contingent" and "unmatured" and "disputed" to the interests of persons who will become sick in the future because of exposure to UNR's asbestos therefore does [*8] not put those

interests beyond the power of the bankruptcy court. n7

The employees sought to appeal the decision to the United States Supreme Court.

Certiorari was denied. n8

---

n4 PLX 26, *In re UNR Indus. Inc., 20 F.3d 766, 768 (7th Cir. 1994)*.
n5 *Id.* at 770
n6 *Id.*
n7 *Id.*
n8 UNARCO *Bloomington Factory Workers v. UNR Indus., Inc., 513 U.S. 999, 115 S. Ct. 509, 130 L. Ed. 2d 416 (1994)*, cert. denied, 63 USLW 3381 (U.S. Nov. 14, 1994) (No. 94-366).

---

In 1994, the United States Congress considered a bill that was designed to provide certainty regarding the durability of channeling injunctions. The legislative history of the Bankruptcy Reform Act of 1994 ("1994 Act") explains that it add(s) "a new *subsection (g) to section 524 of the Code*, establishing a procedure for dealing in a chapter 11 reorganization proceeding with future personal injury claims against the debtor based on exposure to asbestos-containing products. The procedure [*9] involves the establishment of a trust to pay the future claims, coupled with an injunction to prevent future claimants from suing the debtor." n9 It goes on to explain that the procedure in the bill is modeled on the procedure followed when Johns-Manville filed for bankruptcy. n10 It notes that the parties in Manville developed a creative solution, through the creation of a trust to handle future claims, and an injunction "barring new asbestos claims against the emerging debtor company." n11

---

n9 JTX 61, 140 Cong. Rec. H10752-01, 68 (1994).
n10 *In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986)*, aff'd, *78 B.R. 407 (S.D.N.Y. 1987)*, aff'd sub. nom., *Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988)*.
n11 JTX 61, 140 Cong. Rec. H10752-01, 69 (1994).

---

The legislative history further provides:

The asbestos trust/injunction mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming [*10] liability. It is written, however, so that Johns-Manville and UNR, both of which have met and surpassed the standards imposed in this section, will be able to take advantage of the certainty it provides without having to reopen their cases. n12

n12 *Id.*

UNR emerged from bankruptcy in 1989 and commenced implementation on March 2, 1990. The 7th Circuit decision affirming the UNR plan was decided in April 1994. The 1994 Act was adopted in October of that year.

Beginning in 1993, the new UNR began an asset disposition strategy in order to get cash to distribute to the UNR Trust. Between 1993 and 1996 the company sold six operating divisions. The largest had a value of $ 90 million. In all the agreements, Rohn and UNR agreed to indemnify the purchasers for pre-purchase liabilities. No claims have ever been presented. n13 Since the creation of the UNR Trust, each time Rohn has been sued with allegations associated with asbestos, the plaintiff has been informed of the channeling injunction and the matter [*11] has ended. n14

n13 Trial Tr., 57-60, afternoon December 13, 2004.
n14 *Id.*, 58-59.

On July 25, 1996 the Bankruptcy Court entered a Final Decree closing the bankruptcy case in its entirety. n15

n15 PLX 24 at 8, *UNR Indus., Inc.*, Background and Summary of UNR Bankruptcy Reorganization Proceedings (Sept. 24, 1996)

In June or July 2002, Rohn learned that an asset sale in 2002 would generate a significant loss, which would result in a significant tax refund to the company. The concept was refined when, in late October, the company learned for the first time from its auditors that if it closed a deal by the end of December 2002, it would be able to carry losses back for five years. Otherwise, the losses could only be carried back for two years, and the refund would be much smaller. That information created an urgency to [*12] sell the remaining assets of Rohn. n16 Platinum developed an interest in purchasing Rohn in November, 2002.

n16 Trial Tr., 66-68, afternoon December 13, 2004.

Rob Barnett headed Platinum's transaction team. He and others went to Peoria to review documents in November, 2002. As part of the materials provided, Timothy W. Kirk, former vice president, general counsel and corporate secretary of Rohn, gave Barnett a copy of a 1996 memorandum that had been prepared by the law firm of Bell, Boyd & Lloyd (the "BBL legal memo"). The firm had handled the sales and dispositions of the company's assets from 1993 to 1996. The memorandum provided a historical summary of the company and of the bankruptcy litigation, including the channeling injunction and the various court rulings, as well as the 7th Circuit decision. The asset purchase agreement was signed on November 27, 2002. n17 Several assets were involved in the transaction. Included were a plant and equipment located in Peoria, Illinois, which was used for the fabrication [*13] and galvanizing of cell towers; a plant and equipment and real estate in Frankfort, Indiana that manufactured telecommunication accessories such as platforms, braces, and mounting brackets to go on the towers; and a plant, equipment and real estate located in Bessemer, Alabama, where large concrete equipment enclosures were manufactured. None of the assets was related to asbestos. n18 The agreement expressly excluded claims arising from the conduct of the business prior to the closing date. n19

n17 JTX 59 at side letter, *Rohn Indus. Inc., Pfrank LLC, Platinum Equity LLC*: Asset Purchase Agreement (Nov. 27, 2002).
n18 Trial Tr., 80-81, afternoon December 13, 2004.
n19 The Asset Purchase Agreement provides:

2.4 Excluded Liabilities. Buyer and the Sellers agree that Buyer is not assuming any liabilities or obligations of the Sellers. . . .

\* \* \*

(f) unless specifically provided . . ., all liabilities arising in connection with any claim, action, suit or proceeding instituted against Buyer or any of its Affiliates before, on or after the Closing Date related to the conduct of the business of the Sellers prior to the Closing Date, . . . JTX 59 at 15, *Rohn Indus. Inc., Pfrank LLC, Platinum Equity LLC*: Asset Purchase Agreement (Nov. 27, 2002).

[*14]

As part of its due diligence effort, Platinum's attorney, Cynthia Dunnett ("Dunnett"), became aware of assurances from Rohn that no continuing asbestos liability had survived bankruptcy. Since Dunnett's firm lacked the expertise to evaluate that contention, reference was made by Platinum, through its General Counsel, Eva Kalawski, to Bennett Spiegel ("Spiegel") of Kirkland & Ellis. Spiegel was retained on November 20, 2002. Spiegel received materials including the BBL legal memo. He did not review a copy of the asset purchase agreement, although it was read to him later, prior to the decision to terminate. Spiegel was aware that the Bankruptcy Reform Act of 1994 contained a provision, *Section 524(h)*, which attempted to grandfather certain injunctions that had been issued before the legislation was enacted, including the UNR channeling injunction. The focus of his analysis was to determine whether Rohn met the tests set forth in *11 U.S.C.A. § 524(g)* and *(h)* to qualify for the protection provided by the statute. Spiegel concluded that a reasonable argument could be made that the UNR channeling injunction was not grandfathered by the 1994 Act because there was [*15] no fair and equitable finding. n20

n20 Trial Tr., 112, morning December 20, 2004.

Because of those concerns, Spiegel recommended, in early December 2002, that Platinum secure information regarding the solvency of the UNR Trust. The reports revealed that there had been a recent increase in the number of claimants, and that a moratorium on payments had been imposed. The trust did not appear to be financially sound.

By letter dated December 26, 2002, Platinum informed Rohn that it was terminating the contract. n21

The letter says, *inter alia*: "notice is hereby given to the Sellers that Buyer hereby terminates the Agreement pursuant to Section 8.1(c)(iii)(B)(2) of the Agreement." n22 The decision to terminate was based on the advice of Spiegel regarding the risk of future asbestos claims.

n21 The contract called for termination notice to be given by December 11, 2002. By agreement, the deadline was extended to December 27, 2002.

Trial Tr., 103-106, afternoon, December 13, 2004.

[*16]

n22 JTX 25, Termination Letter from Pfrank LLC to Rohn Indus. Inc. (Dec. 26, 2002).

When the Platinum transaction was terminated, a limited liability company called Fogson was created by Rohn's bank lenders. Fogson acquired the assets of Rohn to ensure payment of the $ 20 million tax refund. The Fogson deal resulted in no money to the UNR Trust or to the other shareholders. n23

n23 Trial Tr., 89, afternoon December 13, 2004.

**Applicable Standard**

Section 10.7 of the Purchase Agreement provides that New York law governs. [HN1] New York law provides that the plaintiff in a breach of contract suit bears the initial burden of showing that a valid contract existed and that the defendant terminated the agreement. The burden then shifts to the defendant to prove that it had good cause to terminate. n24 The same standard exists for breach of guaranty. n25 The existence of a valid contract is not contested. The issue presented [*17] in this case is whether Platinum properly terminated under Section 8.1 (c)(iii)(B)(2). Platinum bears that burden of proof.

n24 *Stainless Corp. v. Middlesex (U.S.A.) Inc., 284 A.D.2d 151, 151, 726 N.Y.S.2d 419 (N.Y.A.D. 2001)*.
n25 *Kensington House Co. v. Oram, 293 A.D.2d 304, 305, 739 N.Y.S.2d 572 (N.Y.A.D. 2002)*.

I ruled on summary judgment that Section 8.1 imposes an objective standard for determining what constitutes a *reasonable basis in law and in fact*. That ruling is based on New York law. [HN2] Under New York law, *a reasonable basis in law and in fact* is a legal position that is "substantially justified." n26 Substantially justified means "more than merely undeserving of sanctions for frivolousness." n27 Such a position must be "justified to a degree that could satisfy a reasonable person." n28

n26 *Perez v. New York State Dept. of Labor*, 259 A.D.2d 161, 163, 697 N.Y.S.2d 718 (N.Y.A.D. 1999) (citing *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988)).
[*18]

n27 *Pierce*, 487 U.S. at 566.
n28 *Perez*, 259 A.D.2d at 163.

I also applied an objective standard to a determination of whether the decision to terminate the contract was determined in good faith. [HN3] Good faith requires that a decision not be made arbitrarily or irrationally. n29

n29 *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 392, 663 N.E.2d 289, 639 N.Y.S.2d 977 (N.Y. 1995).

**Section 524 (g) and (h)**

Spiegel understood his engagement with Platinum to be to determine whether Platinum could rely on the channeling injunction to protect it from future claimants. n30 Since Spiegel concerned himself only with the effect of the 1994 Act, the discussion will begin there.

n30 Trial Tr, 5, afternoon December 20, 2004

[*19]

The parts of the 1994 Act offered by Rohn as comfort to Platinum were §§ 524(g) and (h). [HN4] Subsection (g) provides that a court entering "an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction . . . to supplement the injunctive effect of a discharge under this section." n31 The subsection expressly authorizes a channeling injunction with respect to any claim that is to be paid "in whole or in part by a trust. . . ." n32 It limits further proceedings involving the injunction to the district court in which such injunction was entered and it expressly protects transferees of any assets. n33

n31 JTX 62, *11 U.S.C.A. § 524 (g)(1)(A) (1994)*.
n32 *Id. § 524 (g)(1)(B)*.
n33 *Id. § 524 (g)(3)(A)(ii)*.

*Subsection 524(h)* is the grandfathering provision. It permits the benefits provided in *subsection (g)* to apply to channeling injunctions issued before the date of the enactment of the 1994 Act if various conditions [*20] are met. The only condition in dispute in this case requires that:

[HN5] (A) the court determined at the time the plan was confirmed that the plan was fair and equitable **in accordance with the requirements of** *section* **1129(b)**. n34 (emphasis supplied)

n34 *Id. § 524(h)(1)(A)*.

[HN6] *Section 1129(a)* provides the various requirements that must be met in order for a court to confirm a plan. Subpart (a)(8) requires that with respect to each class of claims or interests, the class must accept the plan or not be impaired by the plan. Subpart 1129(b) provides that if all the requirements of (a) are met except (8)-in other words, if it is a contested plan-then the court "shall confirm the plan notwithstanding the requirements of such paragraph [(8)] if the plan does not discriminate unfairly, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under or has not accepted, the plan." n35 (emphasis supplied)

n35 *11 U.S.C.A. § 1129(1994)*.

[*21]

*Section 1129(b)* is invoked only if a plan fails to satisfy *§ 1129(a)(8)*. That subsection is satisfied when all

2005 Del. Super. LEXIS 413, *

classes accept a plan, as was the case with the UNR plan. Consequently, the Bankruptcy Court was not called upon to make a *fair and equitable* finding.

With the 1996 BBL legal memo and associated documentation in hand, n36 Spiegel requested research be conducted by an associate in his firm (the "K&E Memo"). n37 The time records indicate that she spent 3.9 hours on the project, 1.3 doing research, and 2.6 writing the only memorandum ever prepared. n38 The memorandum says that no express *fair and equitable* finding was made by the bankruptcy court, and notes that "we are without key facts to ascertain whether the injunction is still valid to an absolute certainty." It concludes with the following:

> Moreover, *section 524(h)* does not affirmatively state that an injunction that was issued in connection with a plan that does not meet the requirements of *section 524(h)* is necessarily invalid. The UNR plan was also confirmed by the Seventh Circuit Court of appeals [sic], although the issue of the validity of the asbestos injunction was not discussed. *In the Matter* [*22] *of: UNR Industries, Inc., 20 F.3d. 766 (7th Cir. 1994).* n39

[*23]

> n38 DFX 86, Legal Services Invoice from Kirkland & Ellis to Platinum Equity LLC (Dec. 27, 2002).
> n39 JTX 6, Memorandum from Kirkland & Ellis to Platinum Equity Holding (Dec. 7, 2002).

The problem identified by the memorandum, the absence of a *524(h) fair and equitable* finding, became the focus of Spiegel's review because without *524(h)* protection he perceived there to be three specific risks. First, the risk that future claimants would not be bound by the channeling injunction to look to the UNR Trust for compensation. Second, that liability could follow the assets since the text of the channeling injunction did not expressly enjoin an action against a transferee of assets. n40 Third, the channeling injunction was not final; it could be modified later. He advised Platinum that without *524(h)* protection, plaintiffs could go into courtrooms, anywhere in the country, and ignore the injunction. He further advised that the injunction would provide no protection for the asset purchaser. He reasoned that so long as the UNR Trust had money, it would not be a problem, but if the trust [*24] were imperiled, a state court judge might decide that there would be a right to proceed against the successor. n41

---

n36 JTX 13, *UNR Indus., Inc.*, Background and Summary of UNR Bankruptcy, Reorganization Proceedings (Sept. 24, 1996); *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr. N.D.Ill. June 1, 1989); *In re UNR Indus., Inc.*, Confirmation Order (Bankr. N.D.Ill. June 1, 1989); In re UNR Indus., Inc., Consolidated Plan of Reorganization (Bankr. N.D.Ill. March 14, 1989); Letter from Timothy W. Kirk, Rohn Industries, Inc., to Jerry H. Summers (Sept. 8, 2000); Letter from Jerry H. Summers, Summers & Wyatt, P.C., to Timothy W. Kirk (Sept. 19, 2000); *Brown v. T & N PLC, et al*, Notice of Nonsuit as to UNR Industries, Inc. (Sept. 19, 2000).

n37 The memorandum stated the issue differently. It said, "The issue is whether the injunction entered into in connection with UNR debtor plan of re-organization in 1989 is still valid under the law. We are without key facts to ascertain whether the injunction is still valid to an absolute certainty." JTX 6, Memorandum from Kirkland & Ellis to Platinum Equity Holding (Dec. 7, 2002).

n40 The channeling injunction orders that:

> All Entities are permanently restrained and enjoined from taking any action whatsoever for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests, Asbestos-Disease Claims or Asbestos-Property Claims . . . against the Debtors, any Property of the Estates of the Debtors, any of the Debtors' Affiliates, New UNR, any of its property, any of its Affiliates and any of the insurance carriers. . . .

JTX 36 at 6, *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr. N.D.Ill. June 1, 1989).

n41 Trial Tr., 121-125, morning December 20, 2004.

The legal conclusion that *524(h)* may not protect Platinum drove Spiegel's recommendation that Platinum look at the solvency of the UNR Trust.

The plaintiff's expert, Professor Adler, expressed the opinion [*25] that a *fair and equitable* finding was not necessary for UNR to qualify for the protection of *(g)*. He explained:

> *524(h)(1)(A)* says that for a Channeling Injunction to [qualify for]. . . . the safe harbor, . . . the plan confirmed must include a finding that the plan was fair and equitable in accordance with the requirements of *1129(b)*.
>
> *1129(b)* is a provision of the Bankruptcy Code that applies only when a class of claims descends from a reorganization plan.
>
> Putting this together with the *524(h)(1)(A)*, you get the following. That is, if a plan of reorganization involves a class of claims that objected to the plan, but that the plan was approved over that objection, the Court would have had to find that the plan was fair and equitable in order for that plan to satisfy *1129(b)* and thus to satisfy *524(h)(1)(A)*.
>
> The thing about *1129(b)* though, is that it doesn't apply at all if *section 1129(a)(8) of the . . . Bankruptcy Code* is satisfied.
>
> And *1129(a)(8)* is a provision that says if there's an objecting class of claims or interests, then the plan must satisfy *1129(b)*, which in turn suggests that the plan must be found fair and equitable.
>
> In the UNR case, there was no objecting [*26] class of claims or interests, therefore, there was no requirement of fair and equitable under *1129(b)* and it's simply literally true under *524(h)(1)(A)* that the UNR plan did satisfy the requirement that the Court find the plan fair and equitable in accordance with *section 1129(b)*. [sic] Because *Section 1129(b)* did not require a fair and equitable finding, then *524(h)(1)(A)* didn't require one either.

So in accordance with *1129(b)*, a fair and equitable finding was made. n42

n42 Trial Tr., 98-100, morning December 14, 2004.

Adler also points out that it would be illogical for a contested plan, a cram-down plan, to be eligible for the grandfathering protection of *524(h)*, but not for a consensual plan to be eligible. n43 In order to achieve his interpretation of the statute, Adler argues that the words **in accordance with the requirements of** *section 1129(b)* **n44** should be interpreted to mean, "as required by *section 1129(b)*." n45 With such an interpretation, a case such as UNR would not require [*27] *a fair and equitable finding*.

n43 Professor Adler explained, "There is no reason I can even imagine, based on the structure of the way the Bankruptcy Code is designed, to permit a special protection for controversial plans or ones that are passed over dissent and not afford the same protection for plans such as that in UNR where there is no dissenting class."

Trial Tr., 5, afternoon December 14, 2004.
n44 *11 U.S.C.A. § 524 (h)(1)(A)*.
n45 Trial Tr., 43-45, 58, afternoon, December 14, 2004.

Rohn makes the alternate argument that an *1129(b)* finding was made. The confirmation order says: "the other requirements of *Section 1129* have not been put in issue to the extent that the debtor has a burden to establish those requirements, the court determines that burden has been met." n46 The finding is a routine statement made years before the adoption of the 1994 Act. It is part of a general recitation associated with a plan approval. The other channeling injunction to be [*28] protected by the 1994 Act was in the Johns-Manville case. In that case, because it was a cram-down plan, the fair and equitable finding was expressly made.

n46 JTX 17, UNR Indus., Inc.: Confirmation Hearing, Plan of Reorganization, 7th Cir. (Judge David H. Coar).

The defendants called Professor Elizabeth Warren as an expert witness to respond to Adler, and to buttress the opinion of Spiegel.

Warren testified that the UNR channeling injunction does not qualify for the grandfathering protection provided by *Section 524(h)* because the Bankruptcy Court judge did not find that the plan was *fair and equitable*. n47 She, like Adler, explained that the finding was not required because the UNR Plan was a consensual plan, so it fell under *1129(a)*. Since the clear language of *524(h)* requires a *fair and equitable* determination and there was none, because none was required, the grandfathering provision is not available to Rohn. n48 She reaches that conclusion notwithstanding the legislative history that indicates [*29] that both Johns Manville and UNR were intended to be the beneficiaries of the statute. n49 In so doing, she relies on a principle of statutory interpretation: legislative intent is considered only when the language of the statute is ambiguous. n50 Since she concludes that the statute is not ambiguous, she opines that the legislative intent would not be reached. To buttress her position, she cites *Lamie v. United States Trustees* as an example of The Supreme Court's rigid adherence to the clear language of a statute, even when the desired result of the statute was not achieved. n51

----

n47 Trial Tr., 52-55, December 17, 2004.
n48 *Id.*, 46-49.
n49 Chapter 524 [4] of Collier on Bankruptcy summarizes the effect of the 1994 Statute:

> The statute and legislative history make clear that the provisions of *section 524(g)* are to apply to cases in which there already existed an injunction that met the requirements set forth in that section. In particular, the legislative history mentions two cases, those of the Johns-Manville and UNR corporations. (Citation to the Congressional Record omitted.)

*Collier on Bankruptcy*, P524.07 (15th Ed. Revised).

[*30]

n50 Trial Tr., 59-60, December 17, 2004.
n51 *Lamie v. United States Trustee, 540 U.S. 526, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004)*.

----

The argument that the absence of a *fair and equitable* finding defeats the protection provided by the statute would produce an absurd result. It would protect a cram down plan but not a consensual one. In such a circumstance, the text must be treated as ambiguous. [HN7] When a statute is ambiguous, it is appropriate to look at the legislative history. n52 The legislative history could not be more clearly stated.

----

n52 *Hartford Underwriters Ins. Co. v. Union Planters Bake, N.A., 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)* (quoting *United States v. Ron Pari Enterprises, Inc., 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989)* (in turn quoting *Caminetti v. United States, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L. Ed. 442(1917))).*

----

The case of *Lamie v. United States Trustees* is readily distinguishable. It considers entitlement [*31] to attorneys fees under the 1994 Act. The Supreme Court considered the case because Courts of Appeals were split on the issue. n53 The Court of Appeals decision under review had based its decision on the plain meaning of the statute "particularly because application of that plain language supports a reasonable interpretation of the Bankruptcy Code[.]" n54

----

n53 *Lamie, 540 U.S. 533*.
n54 *In re Equipment Services, Inc., 290 F.3d 739, 745 (C.A.4 2002)*.

----

Warren's interpretation does not support a reasonable interpretation of the Bankruptcy Code.

The 1994 Act was enacted to provide comfort. The comfort was necessary to enable companies driven to bankruptcy by asbestos claims to emerge from bankruptcy and to engage in business transactions without the encumbrance of future claims. The statute addressed a number of important issues promptly, thus obviating the need to wait for a body of law to develop regarding the durability of channeling injunctions. But Spiegel was not [*32] looking at this transaction in 1994, he was looking at it in 2002.

Spiegel testified that if the grandfathering provisions of the 1994 Act failed to cover the UNR injunction, the areas of concern were future claimants who were not enjoined by a channeling injunction, the liability of a

transferee or successor of an asset, and the finality of the injunction.

If Spiegel had been opining about the Rohn transaction at the time the statute was under consideration, his focus solely on the protection afforded by the statute would have been appropriate. However, a substantial body of law had developed by 2002, including, **significantly**, a final decision in the UNR case -- the Easterbrook decision that Spiegel did not read. Those subsequent decisions addressed the areas of concern and provided a separate basis for comfort in the transaction.

### Channeling Injunctions for Future Claimants

The K&E memo red flags the fact that there is nothing in the 1994 Act that would operate to *invalidate* an existing permanent channeling injunction. In other words, even if the 1994 Act did not protect UNR, it did not imperil it either. Yet, Spiegel did not do (or request) any research to determine [*33] whether channeling injunctions had been upheld in the interim years. n55 Such an inquiry would have revealed that they have uniformly been upheld. n56

---

n55 Trial Tr., 53-54, afternoon December 20, 2004.

n56 *In re Celotex Corp., 204 B.R. 586, 609 (Bankr. M.D. Fla. 1996)*; *In re Joint E. & S. Dists. Asbestos Litig., 878 F. Supp. 473, 565 (E.D.N.Y. 1995), aff'd in relevant part, 1996 U.S. App. Lexis 2894 (2d Cir. N.Y. 1996)*; *In re A.H. Robbins Co., 88 B.R. 742, 744-54 (E.D. Va. 1988), aff'd, 880 F.2d 694 (4th Cir. 1989)*; *In re Johns-Manville Corp., 68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986), aff'd sub. nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988))*.

---

The K&E Memo also misinformed Spiegel that the 7th Circuit had confirmed the UNR plan "although the issue of the validity of the asbestos injunction was not discussed." n57 That statement is simply incorrect. The 7th Circuit [*34] decision addressed head-on, the arguments advanced by the appellants that the channeling injunction was unconstitutional and that it exceeded the authority of the Bankruptcy Court. Judge Easterbrook made short work of both arguments:

> [Appellants] say that treating as "creditors" persons whose injuries from UNR's products are not yet manifest violates not only the Bankruptcy Code but also the Constitution. The constitutional claim is mysterious. Injuries attributable to past acts are certain to occur; although the identity of the victims remains to be ascertained, the existence of the injury is real enough. . . . The plan of reorganization provides that future claims will be satisfied out of one pile of assets (the Trust) rather than another (New UNR); apportioning claims among assets is a traditional function of bankruptcy adjudication. Principles of tort law, and of corporate reorganizations, do the same, without protest on constitutional grounds . . .
>
> As for the contention that the statute does not contemplate such a step: *11 U.S.C. § 101(5)(A)* defines as a "claim" every "right to payment, whether or not such right is reduced to judgment, liquidated, [*35] unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The definition is capacious, to say the least. Attaching labels such as "contingent" and "unmatured" and "disputed" to the interests of persons who will become sick in the future because of exposure to UNR's asbestos therefore does not put those interests beyond the power of the bankruptcy court. n58

---

n57 JTX 6, Memorandum from Kirkland & Ellis to Platinum Equity Holding (Dec. 7, 2002).

n58 *In re UNR Indus., 20 F.3d 770*.

---

Once the United States Supreme Court denied *certiorari*, the case was returned to the Bankruptcy Court, which implemented the plan and entered a Final Decree in 1996.

### Successor Liability

The 1994 Act provides:

> "No entity that . . . becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity [*36] by reason of its

becoming such a transferee or successor, . . ." n59

The UNR Channeling injunction provides:

> All Entities are permanently restrained and enjoined from taking any action whatsoever for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests, Asbestos-Disease Claims or Asbestos-Property Claims . . . against the Debtors, any Property of the Estates of the Debtors, any of the Debtors' Affiliates, New UNR, **any of its property**, any of its Affiliates and any of the insurance carriers or brokers in the Insurance Litigation . . . n60 (emphasis supplied)

---

n59 *11 U.S.C.A. § 524(g)(3)(A)(ii).*

n60 JTX 36 at 6, *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr. N.D.Ill. June 1, 1989).

---

Spiegel did not conduct research regarding successor liability. n61 Had he done so, he would have found comfort in the case law.[HN8] It is a well-settled rule of corporate law that [*37] "where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor." n62 "Four generally recognized exceptions qualify this principle of successor nonliability. The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." n63

---

n61 Trial Tr., 55-56, afternoon December 20, 2004.

n62 *Polius v. Clark Equipment co.*, 802 F.2d 75, 77 (3d Cir. 1986) (citing 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7122 (Perm.Ed.1983)).

n63 *Id. at 78* (citing *Philadelphia Elec. Co. v. Hercules Inc.*, 762 F.2d 303, 308-309 (3d Cir.

1985); *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 363-364 (3d Cir. 1974)).

---

[*38]

This was an arms-length sale of assets. There is no contention that any of the exceptions listed above is relevant in this case. The purchaser was not assuming liability, it was not a consolidation or merger, it was not fraudulent or intended to provide an escape from liability, and the purchasing corporation was not a mere continuation of the selling company. Rohn would exist after the transaction. Assets, which had never been associated with asbestos, were being transferred. Plain and simple. There was no legitimate basis for Platinum to be concerned about successor liability. Platinum does not argue otherwise in its post-trial papers.

### Finality

Spiegel was concerned that without the protection of *Section 524(g)*, the injunction could be modified or revoked by another court in another jurisdiction.

[HN9] "The doctrine *of res judicata* is not a mere matter of technical practice or procedure' but a rule of fundamental and substantial justice.'" n64 *Res judicata* "requires a showing that there has been (1) a final judgment on the merits in a prior lawsuit involving (2) the same claim and (3) the same parties or their privies." n65 *Res judicata* applies to bankruptcy confirmation [*39] orders. n66

---

n64 *Burke v. Timothy's Restaurant*, 2005 WL 1801684 (D.Del.) (citing *Equal Employment Opportunity Commission v. U.S. Steel Corp.*, 921 F.2d 489, 492 (3d Cir. 1990) (quoting *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 37 S. Ct. 506, 61 L. Ed. 1148, 1917 Dec. Comm'r Pat. 417 (1917))).

n65 *Id.* (quoting *U.S. Steel Corp.*, 921 F.2d 493 (citing *United States v. Athlone Indus., Inc*, 746 F. 2d 977, 983 (3d. 1984))). See also *Rodriguez v. Abbott Laboratories*, 151 F.R.D. 529, 532 (S.D.N.Y. 1993) (citing *Multi-State Communications, Inc. v. United States*, 648 F.Supp. 1203, 1206 (S.D.N.Y. 1986)).

n66 *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir. 1997).

As to the first element, when the United States Supreme Court denied *certiorari*, all challenges to the 7th Circuit decision ended. It was final. As to the second and third elements, the 7th Circuit decided that future claims were claims within [*40] *Section 101(5) of the Bankruptcy Code*, thereby making any future claimant a party; and it affirmed the plan with the channeling injunction as a principal component. All future claimants must look to the UNR Trust for compensation.

I find that there was no reasonable basis in law or in fact for the termination of the agreement. The 1994 Act was an added layer of protection that was thought to be needed at the time it was enacted. Even if the theoretical concerns about the application of the 1994 Act were legitimate, that did not excuse Spiegel's failure to look at the body of law affirming the use of channeling injunctions. The short work made of this task speaks the loudest. The matter was not given appropriate consideration. I have not overlooked the testimony of Dr. Rabinowitz about the surge of asbestos filing in the early 2000's. That surge of activity does not change the law, and the law provided exceptional protection to Platinum. The discussion does not end here, as the defendant argues that it relied on the advice of counsel in rejecting the transaction, and did so in good faith.

**Good Faith**

The termination provision requires that if Platinum [*41] *determines in good faith that there is a reasonable basis in law and in fact* to conclude that it was at risk of *material liability for any asbestos-related claim* as a result of the consummation of the deal, it could terminate the contract. That contract language was specifically added to accommodate Platinum when the parties desired to enter into a contract, but Platinum had not yet completed its due diligence on the asbestos-related issues.

The provision confers discretion on Platinum to terminate the agreement so long as it behaved in good faith. Good faith has been construed in New York to be a promise "not to act arbitrarily or irrationally in exercising that discretion." n67

n67 *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 639 N.Y.S.2d 977 (N.Y. 1995).

Platinum argued in its cross-motion for summary that "settled New York law provides that Platinum's exercise of its discretion under the Asbestos Termination Provision is not reviewable in court, save for good faith."

n68 I agree. [*42] The issue is whether Platinum acted in good faith.

n68 Def. Ans. Br. at 14.

Platinum further argues that it relied on the advice of informed counsel. The defendant has the burden of proving that its breach of the contract was justified; that it acted in conformance with the termination provision. Reliance on advice of counsel is an argument usually used defensively, to *negate* an element of a particular crime or tort, such as fraudulent intent. n69

n69 Gregory E. Maggs, Consumer Bankruptcy Fraud and the "Reliance of Counsel" Argument, Am.Bankr.L.J, 10(1995).

There are no factual disputes about what happened during the last six weeks of 2002. Platinum called on a number of experts to assist in evaluating the Rohn transaction. It hired PricewaterhouseCoopers to analyze pension and employee benefit matters, Project Navigator [*43] to analyze environmental issues, Dunnett from Riordan & McKinsey to handle the transactional matters, and Spiegel of Kirkland & Ellis to advise on asbestos. Spiegel is a bankruptcy partner in Kirkland & Ellis who had handled twenty engagements for Platinum. Since the deal was signed in late November and required closing before the year-end, there was little time available to complete the due diligence. Dunnett and Matt Young, who were managing the Rohn transaction for Platinum, received an opinion from Spiegel orally, then in a report dated December 5, 2002, raising the question of the *fair and equitable* finding, and suggesting that further information be developed about the solvency of the UNR Trust. Dunnett testified that she had no background in bankruptcy matters. n70 When information about the financial condition of the UNR Trust was received, it appeared bleak to Dunnett and Young. The Trust report revealed that a moratorium of payments was in place, that there was an increase in the number of claims, and that Rohn's financial circumstances had led to a drop in the value of the assets of the UNR Trust. n71

n70 Trial Tr., 101, morning December 16, 2004.
[*44]

n71 Trial Tr., 4-5, afternoon December 16, 2004.

Dunnett described the various communications that took place during late December including several conferences with Platinum parties and counsel at Fried Frank who were representing Rohn. Spiegel participated in the discussions, and he was unwavering in his opinion that the channeling injunction would not provide the protection represented to by Rohn to be available.

Dunnett testified that Platinum relied "solely on the advice of Bennett Spiegel with respect to bankruptcy issues." n72 Neither she nor any other attorney at her firm did an independent investigation of the bankruptcy issues delegated to Spiegel. n73 Dunnett testified that "the decision to terminate was made based on the standard relating to the bankruptcy asbestos issue." n74

n72 *Id.*, 70-71.
n73 *Id.*, 74.
n74 *Id.*, 77.

Eva Kalawski was the individual at Platinum who made [*45] the decision to terminate the Rohn agreement on the basis of the asbestos termination provision. n75 She testified that the decision was based on her various conversations with individuals, including Spiegel, who raised questions about Rohn's representation that there was no asbestos liability to be concerned about. n76

n75 Kalawski Dep. 66, Dec. 27, 2004.
n76 *Id.*, 27, 66.

There is nothing in the handling of the due diligence activities by Platinum which suggest to me that there was any reason other than concern about asbestos liability, which formed the basis for their decision to terminate the agreement.

I find that Platinum's decision, made by Kalawski with the concurrence of others, including Dunnett, was made in good faith. Analysis of asbestos liability requires expertise. Platinum acted appropriately in seeking counsel who appeared to have that expertise, and providing him with the best available information. The legal advice that was provided to Platinum, though objectively unreasonable, [*46] caused Platinum to doubt the application of the 1994 Act to the Rohn channeling injunction and to attach unwarranted significance to the financial status of the UNR Trust. That advice, and the insistence of Spiegel that without the protection of the 1994 Act there was a risk of successor liability, gave Platinum a basis in law to terminate the agreement.

Platinum's focus was misdirected by Spiegel to the solvency of the UNR Trust. When it was discovered that the UNR Trust had a moratorium in place, and that its financial condition appeared precarious, Platinum had a basis in fact for the decision to terminate the agreement.

Judgment is entered in favor of the defendant.