Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22048231 (Del.Super.)
**(Cite as: 2003 WL 22048231 (Del.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
STATE of Delaware ex rel., M. Jane Brady, Attorney General of the State of
Delaware, Plaintiff,
v.
WELLINGTON HOMES, INC., a Delaware corporation, Wellington Homes, L.L.C., a Delaware limited liability corporation, 397 Pro-Per Ties, L.L.C., a Delaware limited liability corporation, Christiana Ventures, Inc., a Delaware corporation, Albert Vietri, Tina Marie Vietri, Joseph L. Capano, II and Joseph L. Capano, Defendants.
**No. 99C-09-168-JTV.**

Submitted Aug. 11, 2003.
Decided Aug. 20, 2003.

Upon Consideration of Defendant's Motion for Partial Summary Judgment. Denied.

Olha N.M. Rybakoff, Department of Justice, Wilmington Delaware, for the State of Delaware.

C. Scott Reese, Cooch & Taylor, Wilmington, Delaware, for Defendants Wellington Homes, 397 Properties and Albert & Tina Marie Vietri.

Adam Balick, Balick & Balick, Wilmington, Delaware, for Defendants Christiana Ventures and Joseph Capano.

Richard H. Cross, Jr., Wilmington, Delaware, for Defendant Joseph Capano.

ORDER

VAUGHN, J.

*1 Upon consideration of the defendants' motion for partial summary judgment, the plaintiff's response, and the record of the case, it appears that:

1. In this action the Attorney General seeks civil penalties from the defendants under Delaware's Consumer Fraud and Deceptive Trade Practices Acts. Under those acts, the Attorney General may seek civil penalties if it is determined that a party has willfully violated the provisions of either act. The Attorney General contends that the defendants committed numerous violations of both acts in the course of marketing, selling and constructing new homes in a residential subdivision known as Lea Eara Farms which is located in the area of Middletown, New Castle County, Delaware.

2. The defendants have moved for summary judgment on the counts of the complaint which allege violations of the Deceptive Trade Practices Act ("the Act"), contending that it applies to sales of goods and services and not to the sale of real estate. Their activities, they contend, involve the sale of real estate. The Attorney General contends, in response, that the Deceptive Trade Practices Act does apply to the sale of real estate. The Attorney General also contends that the Act applies to the defendants' activities in this case because the alleged violations arise from the sale of home construction goods and services, not from a sale of real estate.

3. Summary judgment should be rendered if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. [FN1] The facts must be viewed in the light most favorable to the non-moving party. [FN2] Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances. [FN3] However, when the facts permit a reasonable person to draw but one inference, the question becomes one for decision as a matter of law. [FN4]

> FN1. Superior Court Civil Rule 56(c).
>
> FN2. *Guy v. Judicial Nominating Comm'n,* 659 A.2d 777, 780 (Del.Super.1995) *Figgs v. Bellevue Holding Co.,* 652 A.2d 1084, 1087 (Del.Super.1994).
>
> FN3. *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00892-JJF    Document 17-6    Filed 03/23/2006    Page 2 of 16

Not Reported in A.2d                                                                                     Page 2
Not Reported in A.2d, 2003 WL 22048231 (Del.Super.)
(Cite as: 2003 WL 22048231 (Del.Super.))

FN4. *Wooten v. Kiger,* 226 A.2d 238 (Del.1967).

4. The defendants rely upon two Delaware Supreme Court cases. They are the cases of *Young v. Joyce* [FN5] and *Stephenson v. Capano.* [FN6] *Young* involved a sale of an existing house. The Court rejected the contention that the Deceptive Trade Practices Act applied to the transaction. In doing so, it stated that Delaware's Deceptive Trade Practices Act "codifies the Uniform Deceptive Trade Practices Act which, in turn, codifies the common law of unfair competition, *(citation omitted),* and therefore is inapplicable to the facts of this case." [FN7]

FN5. 351 A.2d 857 (Del.1975).

FN6. 462 A.2d 1069 (Del.1983).

FN7. 351 A.2d at 859.

5. "Unfair competition" at common law, generally speaking, referred to unfair competition between businesses or trades. The prefatory note to the 1964 Uniform Deceptive Trade Practices Act speaks of the law of unfair competition as follows:

> Deceptive conduct constituting unreasonable interference with another's promotion and conduct of business is part of a heterogeneous collection of legal wrongs known as "unfair trade practices." This type of conduct is notoriously undefined. Commonly referred to as "unfair competition," its metes and bounds have not been charted. The tort action for deceptive trade practices or "passing off" developed from the common-law action for trademark infringement. It embraced imitation of fanciful and coined marks and names as well as trademarks. The action was historically available whenever one trader diverted patronage from a rival by falsely representing that his goods were the goods of his rival.

*2 Chief Justice Layton described "unfair competition" as follows:

> The essence of unfair competition is the fraudulently seeking to sell one's goods for those of another, and the true test is whether the defendant's acts are reasonably calculated to deceive the average buyer under the ordinary conditions prevailing in the particular trade. [FN8]

FN8. *Coca-Cola Co. v. Nehi Corporation,* 36 A.2d 156, 165 (Del.1944).

Most importantly, as far as this case is concerned, the common law of unfair competition was never thought to have any applicability to the selling of a house or other parcel of real estate from one person to another.

6. *Stephenson* also involved a house, although the house in that case was a proposed townhouse which, it appears, had not yet been constructed when the dispute arose. The Court, citing *Young* and the text of the acts prohibited by the Deceptive Trade Practices Act, stated that the Act prohibits certain conduct with respect to the sale of goods and services, but does not apply to sales of real estate. [FN9] In what appears to be the underlying Superior Court decision in *Stephenson,* the Superior Court judge referred to three unreported decisions, one by the Court of Chancery and two by the Superior Court, which held that the Deceptive Trade Practices Act applies to sales of goods or services and not sales of real estate. [FN10] All of these cases lead to the conclusion that in the years following the enactment of the Deceptive Trade Practices Act, judicial opinion was uniform in this state that the Act applied to sales of goods or services and did not apply to a sale of real estate. 7. Although not directly relevant to the issue presented, it is worthy of note that in *Grand Ventures, Inc. v. Whaley* [FN11] the Delaware Supreme Court held that only a business or trade owner who was the victim of unfair or deceptive trade practices could bring an action to enforce the Deceptive Trade Practices Act. Consumers were held not to have standing under the Act. It would seem to follow, therefore, that neither plaintiff in *Young* or *Stephenson* had standing to bring an action under the Deceptive Trade Practices Act to begin with, although neither case was decided on that issue.

FN9. 462 A.2d 1073. The prohibited acts are set forth in 6 *Del. C.* § 2532(a).

FN10. *Stephenson v. Capano Development Inc.,* 1982 Del.Super. LEXIS 985 (Del.Super.1982).

FN11. 632 A.2d 63 (Del.1993).

8. Although the Attorney General contends that the Deceptive Trade Practices Act has always covered transactions in real estate, the active development of the Attorney General's argument begins with an amendment to the Act which became law in 1994. In that year the Attorney General was given authority to enforce the Deceptive Trade Practices Act. [FN12] The pertinent amendment reads as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00892-JJF   Document 17-6   Filed 03/23/2006   Page 3 of 16

Not Reported in A.2d                                                                                   Page 3
Not Reported in A.2d, 2003 WL 22048231 (Del.Super.)
(Cite as: 2003 WL 22048231 (Del.Super.))

FN12. 69 *Del. Laws* Ch. 203; 29 *Del. C.* § 2517(c)(2); 6 *Del. C.* § 2533(d).

The Attorney General shall have standing to seek, on behalf of the State, any of the remedies enumerated in this section for violations of § 2532 of this title against affected persons including but not limited to consumer purchasers. [FN13]

FN13. 6 *Del. C.* § 2533(d).

The grant of standing to the Attorney General to seek remedies for harm to consumers expanded the Deceptive Trade Practices Act beyond the common law of unfair competition. In 1998 this provision was amended to read as follows:

*3 The Attorney General shall have standing to seek, on behalf of the State, any remedy enumerated in this section for any violation of § 2532 that is likely to harm any person, including but not limited to individual retail purchasers and consumers of goods, services or *merchandise.* (emphasis added). [FN14]

FN14. 71 *Del. Laws* Ch. 470; 6 *Del. C.* § 2533(d).

The synopsis to the 1998 bill indicates that the amendment was intended to clarify the Attorney General's ability to pursue violations of 6 *Del. C.* § 2532. [FN15] The Attorney General contends that "merchandise" includes real estate and that the Deceptive Trade Practices Act's applicability to sales of real estate has now been clarified. In support of this contention, the Attorney General points to the definition of merchandise in the Consumer Fraud Act. That act defines merchandise as follows:

FN15. § 2532 sets forth the prohibited trade practices.

"Merchandise" means any objects, wares, goods commodities, intangibles, real estate or services. [FN16]

FN16. 6 *Del. C.* § 2511(4).

The Attorney General argues that under the doctrine of *pari materia,* the word "merchandise" should be defined consistently in both acts. Since "merchandise" expressly includes real estate in the Consumer Fraud Act, the Attorney General argues, it should also include real estate in Deceptive Trade Practices Act. If the Attorney General's argument is correct, then it follows that the Attorney General has standing to seek remedies under the Deceptive Trade Practices Act for harm to purchasers of real estate where no sale of goods or services is involved.

9. There are countervailing factors, however, which do not support the Attorney General's argument. The prohibited acts which the Deceptive Trade Practices Act condemns are set forth in § 2532 in 12 paragraphs. They have not been materially altered, if at all, since the Act was originally adopted. Nine of those paragraphs expressly apply to transactions or matters relating to goods, or goods or services, not real estate. None of the 12 paragraphs expressly, or by implication, pertain to an isolated sale of real estate. Moreover, the word "merchandise" does not, by common definition, include real estate. In addition, the introductory phrase to the definitional section of the Consumer Fraud Act states that the definitions apply to that subchapter. The Deceptive Trade Practices Act is contained in a separate subchapter. It has its own section of definitions, and the word "merchandise" is not among them. Interpreting "merchandise" to include real estate in the Deceptive Trade Practices Act stretches statutory interpretation too far. For these reasons, I reject the plaintiff's contention that the word "merchandise" in the Deceptive Trade Practices Act includes real estate. The above-mentioned cases which held that the Deceptive Trade Practices Act does not apply to a sale of real estate would appear still to be good law, until either a reinterpretation by the Delaware Supreme Court or a new statutory amendment clearly extends the Deceptive Trade Practices Act to simple real estate transactions not involving a sale of goods or services.

*4 10. The Attorney General's alternative contention is that the activities of the defendants in this case do, in fact, involve the sale of goods and services. A contract for the construction of a new home, the Attorney General contends, is a contract for the sale of construction goods and services. Whether the construction of a new dwelling involves goods or services is not something that was considered in the cases relied upon by the defendants. This alternative contention has more persuasive force than the Attorney General's first contention.

11. Apart from the existence of the disputes which give rise to this case, the manner in which new homes were sold in Lea Eara Farms seems typical of the manner in which homes are often sold in new real estate developments. A model home is available for inspection, as was the case here. The buyer may be able to select from among several models through the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw_Document_12_34_34_3500

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22048231 (Del.Super.)
**(Cite as: 2003 WL 22048231 (Del.Super.))**

Page 4

use of advertising materials which show floor plans and the like. The buyer is often offered options for extras or upgrades. These options sometimes deal with the quality or grade of materials. Sometimes they are additional features. The price of the home is adjusted as the buyer makes his and her choices. The parties then enter into a contract in which the developer agrees to construct the home and the buyer agrees to buy it upon completion. All of this goes on in a context of marketing and advertising efforts on the part of the developer.

12. The task of building a new house for a buyer, with its attendant labor and expertise, is a service. Many of the counts of the complaint alleging violations of the Deceptive Trade Practices Act address themselves to acts related to the construction of the house, such as alleged deviations from the model home, failure to include standard features, deviations from plans as approved by the county, failure to comply with the county building code, substandard construction, and the like. I am persuaded that new home construction, as described above, does involve a package of goods and services. They are goods and services notwithstanding the fact that they are ultimately combined into an assembled dwelling which becomes real estate on a lot which is also included in the sale.

13. The conclusion that new home construction is a sale of goods and services is consistent with a number of authorities in other jurisdictions which have arrived at the same or similar conclusions. [FN17]

> FN17. *Woods v. Littleton,* 554 S.W.2d 662 (Tex.1977); *Jim Walter Homes, Inc. V. Mora,* 622 S.W.2d 878 (Tex.App.1981); *Precision Homes, Ind. v. Cooper,* 671 S.W.2d 924 (Tex.App.1984); *Keiber v. Spicer Construction Co.,* 619 N.E.2d 1105 (Ohio App.1993); *McKinney v. State,* 693 N.E.2d 65 (Ind.1998); *Polonetsky v. Better Homes Depot, Inc.,* 760 N.E.2d 1274 (N.Y.Ct.App.2001).

14. Although *Stephenson* involved the sale of a townhouse which had not yet been constructed, it is distinguishable from this case. The dispute in that case arose because the developer refused to sell the townhouse as agreed, leading to a decree of specific performance in the Court of Chancery. An action followed in the Superior Court for damages for loss of mortgage financing which had been promised as part of the original contract. *stephenson* addressed issues relating to damages from the loss of financing. The dispute did not arise out of the construction of the townhouse itself. Whether or not disputes arising from the construction of a new home could be disputes involving goods and services was a question not fairly presented to the Court.

*5 15. The two cases relied upon by the defendants are not dispositive. The construction of a new home does involve a sale of services and goods associated with those services. The defendants are not entitled to judgment as a matter of law.

16. One of the homes involved in this case is the model home, which was sold to a buyer. The record of the case, as presented to the Court, is insufficient to allow a judgment to be formed as to whether the sale was a simple sale of real estate, or a transaction which included goods or services. When the facts and circumstances surrounding the sale of the model home are more developed in the record, summary judgment as to the model home can be considered.

17. Therefore, the defendants' motion for partial summary judgment is *denied.*

IT IS SO ORDERED.

Not Reported in A.2d, 2003 WL 22048231 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw_Document_12_34_34_3500

Westlaw.

Not Reported in A.2d                                                                                         Page 1
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
RYPAC PACKAGING MACHINERY INCORPORATED, Plaintiff and Counterclaim-Defendant,
andJoseph POGES, Counterclaim-Defendant,
v.
Daniel COAKLEY and Package Automation Company, Defendants and Counterclaim-Plaintiffs,
Paul OSBORNE, Robert Wischhusen and Penndel Packaging, Inc., Applicants for Intervention.
No. CIV. A. 16069.

May 1, 2000.

Edward M. McNally, Esquire, of Morris, James, Hitchens & Williams LLP, Wilmington, Delaware; Attorneys for Plaintiff and Counterclaim Defendant Rypac Packaging Machinery Incorporated and Joseph Poges.
Laurence V. Cronin and Michele C. Gott, Esquires, of Smith, Katzenstein & Furlow LLP, Wilmington, Delaware; Attorneys for Defendants and Counterclaim-Plaintiffs.
Collins J. Seitz, Jr., Esquire, of Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, and Mark T. Mullen, Esquire, of Cozen and O'Connor, Philadelphia, Pennsylvania; Attorneys for Intervening Defendants.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.
*1 In this action the plaintiff, Rypac Packaging Machinery Incorporated ("plaintiff" or "Rypac"), claims that defendant Daniel Coakley ("Coakley"), a Rypac former director and officer, breached his fiduciary and contractual duties to Rypac by competing with Rypac after he purported to resign from it. Rypac also charges Coakley with various tort violations. Named as a co-defendant is Package Automation Company ("PAC"), a company that Coakley owns and controls.

PAC has asserted counterclaims against Rypac and Joseph Poges ("Poges"), Rypac's sole remaining officer, for wrongfully causing Rypac to withhold commissions due Coakley on sales that Coakley made before he resigned from Rypac.

Thereafter, Robert Wischhusen ("Wischhusen") and Paul Osborne ("Osborne"), two sales representatives who also had left Rypac, (collectively, "Intervening Defendants") intervened in this action. [FN1] The Intervening Defendants claim that Rypac owes them commissions that Poges wrongfully withheld. In response, Rypac has asserted a claim against the Intervening Defendants for aiding and abetting Coakley in breaching his fiduciary duties to Rypac.

> FN1. A third Intervening Defendant is Penndel Packaging, Inc. ("Penndel"), a Wischhussen-owned company.

This is the Opinion of the Court after a trial on the merits of all these claims. For the reasons discussed below, I conclude that all but one of Rypac's claims lack merit, and will therefore grant judgment for the defendants and Intervening Defendants on those claims. The sole exception is the plaintiff's claim to recover certain commissions diverted from Rypac by Coakley and the Intervening Defendants, on which claim I will grant judgment for Rypac. Lastly, I determine that the defendants and Intervening Defendants are entitled to judgment on their counterclaims, except for their Delaware Wage Act claim for liquidated damages.

I. RELEVANT FACTS

In 1986, Daniel Coakley and Joseph Poges left their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 2
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

employment with Professional Packaging Associates ("PPA"), to start their own business. They formed a partnership named "Rypac." In their new capacities as Rypac partners, Coakley and Poges acted as independent sales representatives for manufacturers of packaging machinery in substantially the same territories they had previously serviced for PPA. Poges covered New Jersey, and Coakley covered New York and Connecticut. [FN2] Both partners agreed that each would be responsible for generating all sales within his assigned territory, and that each would receive 80% of the gross commissions due them based upon the sales they respectively generated. The remaining 20% of the gross commissions would be paid to Rypac to defray joint expenses and to make contributions to each partner's individual retirement account. [FN3]

FN2. TR Poges 19; TR Coakley at 264.

FN3. TR Coakley 265.

In December 1987, because of concerns about individual liability risks, Poges and Coakley decided to incorporate Rypac. [FN4] Accordingly, they formed a Delaware corporation named Rypac, to which they transferred the partnership assets. The two former partners each received 50% of Rypac's stock, and also were elected as Rypac's sole directors and officers, with Coakley serving as President and Poges as Vice-President and Secretary/Treasurer. [FN5] Coakley and Poges also agreed to, and later did, enter into a Shareholder's and Officer's Agreements with Rypac. The relevant provisions of the Officer's Agreement are discussed *infra* in greater detail. [FN6]

FN4. TR Poges 8-9; TR Coakley 266-67.

FN5. PX 30; DX4; PX 31.

FN6. *Id.*

*2 After incorporating Rypac, Coakley and Poges continued operating the business as they did when Rypac was a partnership, except that eventually Coakley and Poges each employed subagents to help expand their respective (and separate) territories. [FN7] Coakley brought into the firm as subagents his brother Donald Coakley as well as Andy Grospin ("Grospin") and Rick Marshall ("Marshall"). Poges brought into his firm as subagents Osborne, Wischhusen and Dan Willis ("Willis"). [FN8]

FN7. TR Coakley 267.

FN8. PX 1 to 5 and 10-12.

Coakley and Poges each continued to be exclusively responsible for the sales in his respective territory, and neither received any income from sales generated by the other. [FN9] As compensation for their sales efforts, Coakley and Poges received 75% of the gross commissions collected on their individual sales, payable within 30 days after Rypac received the commissions. [FN10] Of the remaining 25% of gross commissions, 10% was deposited in the retirement plan of the person responsible for the sale, and 15% was paid to Rypac to defray expenses that Rypac incurred. [FN11]

FN9. TR Coakley 267.

FN10. Although the Officer's Agreement provided that each officer would receive 80% of the gross payments, at some point Coakley and Poges informally agreed to receive 75%, thereby amending the Agreement in that respect. TR Poges 17-18.

FN11. *Id.* Coakley and Poges compensated their subagents differently, however. Poges' subagents received 90% of each gross commission that they earned with the remaining 10% going to Rypac for expenses, whereas Coakley's subagents received 75% with the remaining 25% going to Rypac for expenses. TR Osborn 346; TR Wischhusen 426.

Rypac did not retain the amounts that were contributed to it for expenses. [FN12] That is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

because expenses were classified as either corporate (in which case they were shared equally between Coakley and Poges) [FN13] or individual [FN14] (in which case they were allocated among, and paid by, Coakley, Poges and their subagents). [FN15] Once Rypac's expenses were thus allocated, if the total contributions to Rypac for expenses exceeded the amount of expenses Rypac actually incurred, the excess was distributed *pro rata* as additional compensation to Coakley and Poges. [FN16] If, on the other hand, the amounts contributed by each officer and his subagents fell short of the total expenses attributed to that officer's "side" of the business, that officer would pay Rypac the difference. [FN17]

FN12. TR Poges 116-24.

FN13. Corporate expenses included items such as professional fees, licenses and permits, lease and office expenses, and taxes. Typically, these expenses amounted to approximately $40,000 per year. DX 39; TR Poges 121-22.

FN14. DX 39.

FN15. For example, DX 36 and DX 39 show how each representative was charged separately for the amount of time Rypac's secretary, Linda Newberger, spent working on its projects.

FN16. TR Poges 116-24. In calculating the amount of any such distribution, Coakley and Poges were each charged with the expenses allocated to all their subagents in their respective territories. TR Poges 116-24; TR Coakley 269-27; DX 36-DX 39.

FN17. TR Poges 18-19; TR Coakley 271.

By the very nature of this expense allocation system, at the end of each year Rypac always had no income. [FN18]

FN18. TR Poges 117; TR Willis 226 (stating that "year to year the corporation was run as a zero sum gain").

A. The Sales Representative's Role

In this industry, persons associated with companies such as Rypac typically serve as independent sales representatives for manufacturers of packaging machinery. Those manufacturers are called "principals." [FN19] A sales representative's role involves not only negotiating the sale, but also working closely with the customer and the principal to customize the specifications for the customer's particular process. [FN20] Typically, a potential sale is identified by a principal, who then contracts with a sales representative at a company like Rypac to call upon the potential customer and negotiate an order. [FN21] After an order is placed, the sales representative continues to serve as the contact between the principal and customer, to coordinate the delivery and installation of the equipment ordered, and to respond to any customer questions or problems in connection with the sale. [FN22] The sales representative has the authority to bind the principal throughout the entire process, which may take months to conclude. [FN23] Given the importance of the independent sales representative's role, the principal has a strong interest in choosing a sales representative with experience and a record of good relationships with customers. [FN24]

FN19. TR Poges 5-8; TR Coakley 266.

FN20. TR Poges 5-6, 59-65.

FN21. TR Poges 59-65.

FN22. *Id.*

FN23. *Id.*

FN24. TR Wolford 382; TR Fissel 415.

*3 Principals and sales representatives frequently enter into agreements that give the sales representative an exclusive right to market the principal's machinery. But, such agreements are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 4
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

usually terminable on thirty days notice. [FN25] Under the industry practice, once an exclusive agreement is terminated, the principal is free to choose a new sales representative to complete the sale on which the former representative had been working. Unless he receives "commission protection," the former representative loses any right to a commission generated by that sale. [FN26]

> FN25. TR Poges 98, 196-97; TR Willis 226-27; TR Fissel 405; PX 12; DX 68; IDX 45; IDX 43, ¶ 16.
>
> FN26. TR Wolford 393-94.

To protect his commission interest, a sales representative often will request "commission protection," which usually takes the form of a fixed contractual time period during which the sales representative is allowed to, and must, complete the contract in order to receive the commission. [FN27]

> FN27. TR Poges 137, 140-41; TR Wolford 393-94; TR Fissel 406-407.

### B. Coakley Leaves Rypac

In September 1997, Coakley decided to leave Rypac and continue in the business of selling packaging machinery through his own company. [FN28] On October 10, 1997, Coakley met Poges for breakfast and told Poges that he had been unhappy with their relationship for some time, that he was resigning from Rypac, and that he would continue working in the packaging machinery industry in competition with Rypac. [FN29] Poges voiced no objection. [FN30]

> FN28. TR Coakley 276-79. That company later became PAC.
>
> FN29. TR Poges 29; TR Coakley 282.
>
> FN30. TR Poges 127-29; TR Coakley 283.

Coakley then called Rypac subagents Donald Coakley, Wischhusen, Osborne, and Grospin, to inform them that he had resigned. [FN31] Coakley also sent a letter to certain principals, advising them of his resignation. [FN32]

> FN31. TR Coakley 283.
>
> FN32. TR Coakley 282-83.

### 3. Events After Coakley's Resignation Announcement

#### 1. Wischhusen and Osborne Resign

On October 11, 1997, all of Rypac's employees went to Las Vegas to attend a trade show. [FN33] After arriving, Coakley met with Wischhusen, Osborne and others for a previously arranged golf outing. [FN34] Coakley was asked about his resignation from Rypac and about his future plans, but felt it was inappropriate to discuss the matter at the golf outing. [FN35] Coakley scheduled a breakfast meeting to discuss his plans with Wischhusen and Osborne for the following Monday, October 13, 1997. [FN36]

> FN33. TR Coakley 284.
>
> FN34. *Id.*
>
> FN35. TR Coakley 285-86.
>
> FN36. TR Coakley 285-87; TR Osborne 366; TR Wischhusen 432, 444.

At that breakfast meeting, Coakley outlined his plans, and invited Wischhusen and Osborne to join his new firm, PAC. Both agreed to join Coakley. [FN37] Wischhusen and Osborne then sought out Poges, who was also attending the trade show, and told Poges that they were resigning from Rypac. [FN38] Osborne and Wischhusen were free to do that, since neither had ever entered into a non-compete agreement with Rypac. [FN39]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 5
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

FN37. *Id.*

FN38. TR Osborne 366-67; TR Wischhusen 433.

FN39. TR Poges 23-24; TR Osborne 346; TR Wischhusen 425-26.

### 2. Rypac and PAC Compete

Over the next three weeks, Coakley and Poges each made presentations to Rypac principals, including those who had retained Rypac on an exclusive basis. [FN40] As the sales manager of one principal (Hi-Speed) explained, it was important for the principals to decide quickly who would represent them, to assure that they would not lose business. [FN41]

FN40. TR Poges 43-44; 127-29; TR Coakley 292; TR Fissel 410-15; TR Wolford 387-92.

FN41. TR Wolford 387.

Certain of Rypac's exclusive agreements permitted the principal to terminate the contract if there was a change in Rypac's ownership. For example, Rypac's exclusive agreement with Mateer-Burt permitted Mateer-Burt to terminate "immediately on notice to [Rypac] in the event that ... (ii) either Poges or Coakley ceases to own, individually, shares of [Rypac] which represent at least 26% of the regular voting power of [Rypac], (iii) Poges or Coakley ceases to participate actively [Rypac's] activities pursuant to this Agreement..." [FN42] Rypac's exclusive agreement with SASIB was similarly subject to immediate termination by SASIB "upon a change in ownership, management or geographical location of [Rypac]..." [FN43]

FN42. PX 12, ¶ 12.2.

FN43. IDX 45, ¶ 10.D. Rypac's agreement with Hi-Speed did not literally provide for termination upon a change in ownership of Rypac, but it did define the representative, Rypac, as "consisting of Daniel P. Coakley located at 23 Dingle Brook Lane, Newtown, Connecticut 06270 and Joseph Poges located at 27 Warren Cutting, New Jersey 07930." In this way, the practical effect of a change of Rypac's ownership would be the same. DX 68.

*4 After hearing presentations from PAC and Rypac, three principals decided to terminate their exclusive contracts with Rypac and enter into new exclusive contracts with PAC. [FN44] At that point, Poges and Rypac became free to-and did-seek commission protection on sales that Rypac was currently pursuing for SASIB, Mateer-Burt and Hi-Speed, and they received such protection on some of the projects on which Poges was working. [FN45] Importantly, Poges did *not* ask for (or receive) commission protection on the ongoing projects of the sales representatives who were leaving Rypac to join Coakley. [FN46]

FN44. TR Coakley 292-93. Hi-Speed, chose PAC because Rypac's presentation " was not clear enough for Hi-Speed to feel comfortable" with Rypac's ability to support continued sales growth. TR Wolford 381, 387-92. Hi-Speed was also concerned with the fact that Poges, who was requesting to continue the relationship with Hi-Speed, did not take the lead in presenting Rypac's proposal. TR Wolford 388-89. Another principal, Mateer-Burt, felt that the personnel at PAC could obtain more business for Mateer-Burt based on their experience, relationships with customers and knowledge of equipment. TR Fissel 415.

FN45. TR Poges 137-38.

FN46. TR Poges 137-41.

Shortly after PAC and Rypac began competing against each other, Poges began withholding-from Coakley and the other sales representatives who had left Rypac-commissions earned on sales that had been completed *before* their resignations but that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 6
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

were paid to Rypac *after* their departure. [FN47] In an effort to resolve this dispute, Coakley tried to contact Poges by telephone and letter on several occasions, but Poges refused to communicate with him. [FN48]

FN47. TR Coakley 297-302.

FN48. *Id.*

Coakley reacted to Poges' stonewalling by writing letters to certain Rypac principals, asking them to send commission checks on sales they had completed under Rypac, directly to Coakley rather than to Poges. [FN49] Coakley intended to deposit those checks in a bank account he had created in the name of Rypac, and from that account he would disburse funds in the manner Rypac had historically employed to compensate Rypac's representatives. [FN50]

FN49. TR Coakley 297-302, 335-36; PX 38; PX 39.

FN50. TR Coakley 297-302, 335-36.

In an apparent further effort to procure the release of the withheld commissions, Coakley wrote a letter to Poges on December 11, 1997, stating that he had "not terminated [his] presidency or officers [sic] position with Rypac." [FN51]

FN51. TR Coakley 301-302; PX 45.

This lawsuit by Rypac followed.

## II. THE CONTENTIONS

Each side has asserted numerous claims against the other. The plaintiff, Rypac, claims that Coakley: (1) breached his fiduciary duty by usurping a corporate opportunity belonging to Rypac, (2) breached the provision of the Officers' Agreement that required Coakley to devote his time exclusively to performing his duties as a Rypac officer, (3) committed tortious interference with Rypac's existing contracts, and (4) unfairly competed with Rypac. The plaintiff also claims that the Intervening Defendants aided and abetted Coakley's breaches of duty.

The defendants counterclaim that Rypac wrongfully withheld commissions that Coakley had earned before his resignation. The Intervening Defendants claim that they also are owed commissions that Rypac has wrongfully withheld.

These claims are now addressed.

## III. THE PLAINTIFF'S CLAIMS

All of the plaintiff's liability theories are asserted as a basis for Rypac's claim to recover the commissions earned by Coakley and PAC through December 22, 1997.

### A. The Corporate Opportunity Claim

Rypac's first claim is that Coakley usurped corporate opportunities belonging to it by causing his corporation, PAC, to acquire several of Rypac's contracts between October 10, 1997 and December 22, 1997. Rypac claims that because Coakley did not validly resign until December 22, 1997, Coakley continued to owe a fiduciary duty to Rypac until that time, and that he breached that duty by obtaining contracts from Rypac principals in competition with Rypac.

*5 Coakley responds that he had no fiduciary duty to Rypac after October 10, 1997 because he validly retired on that date, and not on December 22, 1997 as the plaintiffs contend. The defendants argue that there is no evidence that Coakley appropriated any opportunity or contract from Rypac before October 10, 1997, [FN52] and that after that date Coakley was no longer prohibited from competing with Rypac. Alternatively, the defendants argue that even if Coakley did not retire until December 22, 1997, the plaintiff has failed to establish that Rypac's contracts with the third party principals were "corporate opportunities."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 7
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

FN52. That argument is valid. Coakley testified that the only actions he took before meeting with Poges on October 10, 1997 were to discuss his plans with his wife and brother and to prepare letters to certain principals advising them of his resignation. TR Coakley 277, 282-83. That testimony is uncontroverted.

These contentions raise two issues. The first issue is when did Coakley retire-October 10 or December 22, 1997? The second issue is whether Rypac's contracts with principals which the principals terminated after October 10, 1997, were "corporate opportunities."

1. When Coakley Resigned

The first dispute concerns when Coakley resigned. Rypac claims that Coakley did not resign until December 22, 1997. The defendants contend that Coakley resigned on October 10, 1997 and from that point on was free to compete with Rypac, because after October 10 Coakley no longer owed Rypac any fiduciary duties.

To aid the analysis of this issue, it is helpful to set forth the relevant events in chronological order, as follows:
- *October 10, 1997*-Breakfast meeting where Coakley tells Poges that he had been unhappy with their relationship for some time and was resigning from Rypac.
- *October and November 1997*-Poges removes Coakley from the Rypac telephone recording, as a signatory on Rypac's bank accounts, and from Rypac's health plan.
- *October 16, 1997*-Coakley sends Poges a letter stating that he is in the "process [of] terminating [his] relationship with Rypac."
- *November 1997*-Coakley holds himself out to third parties as Rypac's president.
- *December 8, 1997*-Poges sends Coakley a letter stating that "[y]ou have terminated your relationship with Rypac and are no longer an officer or director of the company."
- *December 11, 1997*-Coakley responds that he had "not terminated [his] presidency to officers [sic] position with Rypac."
- *December 22, 1997*-Coakley sends Poges a formal resignation letter.

Despite this somewhat erratic sequence of events, I conclude that Coakley resigned on October 10, 1997. During the October 10 breakfast meeting, Coakley told Poges that he was resigning. [FN53] Poges and Coakley both understood that to mean that Coakley was resigning all his positions in the company, including President, director, and employee, effective immediately. [FN54] Poges's subsequent conduct was consistent with that understanding. Poges immediately advised sales representatives and principals that Coakley had resigned, [FN55] and he also removed Coakley from Rypac's telephone message recording, bank accounts and health plans. [FN56]

FN53. TR Poges 29-32.

FN54. At trial, Poges admitted that he understood that Coakley had resigned as of October 10, 1997:
Q. Now at what point, on October 10 or thereabouts in 1997, in your mind did you actually think that Mr. Coakley had resigned?
A. Yes. (TR Poges 31-32.)

Q. Now, as you previously testified, you understood that when Dan Coakley met with you on October 10, 1997, that he had resigned from Rypac as an office and director, correct?
A. Correct. (TR Poges 127.)

FN55. TR Wischhusen 428; TR Fissel 408.

FN56. TR Poges 130-35.

Although his actions were ill-advised and possibly actionable on noncontractual grounds, Coakley's representations to third parties that he was Rypac's president and his December 11, 1997 letter, did not legally alter the fact that Coakley had resigned on October 10, 1997. [FN57] At most, that conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 8
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

would have constituted a unilateral, revisionist attempt by Coakley to rescind his termination for strategic reasons known only to him. Because both parties had relied on the resignation that Coakley orally communicated a month and a half before, and because they understood that communication to mean that Coakley's resignation was effective immediately, Coakley was powerless to rescind that resignation unilaterally and six weeks later without Poges' concurrence, which was never granted. [FN58]

> FN57. In his December 11th letter, Coakley wrote, "I have terminated my sales position with Rypac, but I have not terminated my presidency or officers [sic] position with Rypac." TR Coakley 301-302; PX 45.
>
> FN58. Eleven days later, Coakley sent Rypac a formal letter of resignation which, as a purely legal matter, was superfluous. TR Coakley 301-302.

*6 Accordingly, I conclude that the only legally sensible interpretation of the evidence is that Coakley resigned on October 10, 1997, and that Poges, Rypac's only other shareholder, knew that.

### 2. Whether Rypac Contracts Were "Corporate Opportunities"

Even if one could conclude that Coakley did not resign until December 22, 1997, the corporate opportunity claim must fail, because Rypac's sales contracts with principals were not "corporate opportunities." In approaching this fact-intensive issue, several factors must be considered, including the availability of the opportunity to the corporation; the corporation's interest or expectancy in the opportunity; and whether by taking the opportunity the corporate fiduciary has placed himself in a position adverse to the interests of the corporation. [FN59]

> FN59. 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 4.36 (2d ed.1999); *see also Balin v. Amerimar Realty Co.,* Del. Ch., C.A. No. 12896, Jacobs, V.C., Mem. Op. at 6 (Nov. 15, 1996).

Neither side disputes that the pre-resignation ongoing sales contracts fell within Rypac's "line of business," and would have been advantageous to Rypac's officers. But, those contracts contained terms that negated the other elements of a corporate opportunity; that is, the readily terminable nature of the contracts deprived them of the status of an "interest or expectancy" to which Rypac had an equitable ownership claim.

As earlier stated, given the sales representative's important role in negotiating and facilitating the contracts, [FN60] principals in this industry have a strong interest in choosing for themselves who will represent them in these transactions. Although principals sometimes enter into exclusive agreements for companies such as Rypac to represent them in specified geographic areas, such agreements are typically terminable on only thirty days notice to enable the principals to change sales representatives quickly. When an exclusive agreement is terminated, the principal is free to choose a new sales representative to complete the sale on which the former representative had been working, with the new representative being entitled to collect the commission. [FN61]

> FN60. See pages 6-7, *supra.*
>
> FN61. The exception arises in cases where representatives seek commission protection, which takes the form of the principal agreeing that once the sales representative begins working on a particular project, the sales representative has a fixed period of time in which to complete the sale and earn the commission. Poges' own conduct after Coakley and the other representatives resigned evidences that Poges did not consider the contracts at issue as opportunities belonging to Rypac. After

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 9
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

four principals terminated their exclusive agreements with Rypac, Poges requested commission protection only on those sales that he was pursuing. Poges never asked for protection on the sales being pursued only by Coakley or his subagents. TR Poges 137-41.

Thus, even if instead of competing, Coakley had simply stopped doing business after his resignation, it cannot be assumed that the principals would have permitted Rypac to complete the sales Coakley was pursuing before he resigned. Given the national and highly competitive nature of this particular market, there is no basis to assume that any principal would have automatically chosen Rypac to complete the sales.

Moreover, Rypac's manner of operating undercuts its claim that the potential sales were corporate opportunities. As this Court recognized in *Balin v. Amerimar Realty Co.*,[FN62] where the corporation could never have profited from or been advantaged by the claimed opportunity, the opportunity cannot be fairly said to be one belonging to the corporation.

> FN62. *Balin v. Amerimar Realty Co.*, Del. Ch., C.A. No. 12896, Jacobs, V.C. (Nov. 15, 1996). In *Balin,* the Court rejected the claim that real estate investments represented opportunities belonging to the corporation on the basis that the corporation was formed and always operated solely as an "overhead" entity to centralize costs, and was never intended to nor did it earn a profit from the investments in question.

In this case, Rypac was an umbrella entity for two separate businesses, one operated by Coakley, the other by Poges. Coakley and Poges were each responsible for sales in their respective territories, and Rypac earned no profit from those sales. Commissions that Coakley and Poges earned were immediately paid to the individual responsible for the sale, except for a small percentage that was paid to Rypac as reimbursement for its expenses. Rypac never profited from the sales of its subagents. Rather (as with Coakley and Poges) commissions earned by the subagents were paid immediately to the responsible subagent, again with a percentage going to Rypac for expenses. To the extent the amounts contributed to Rypac exceeded the expenses, the excess was distributed *pro rata* to Coakley and Poges. Because under this arrangement Rypac was little more than a disbursing agent with no business of its own, it is not practically meaningful to characterize Rypac's contract with a principal as a Rypac "corporate opportunity."

*7 For these reasons the corporate opportunity claim must be rejected.

### B. The Officer's Agreement Claim

Next, Rypac claims that Coakley violated Paragraph 3.b of the Officer's Agreement, which (Rypac contends) obligated Coakley not to compete with Rypac until the Agreement was terminated. Paragraph 3.b states:
Officer shall devote all of his time, attention and energy exclusively to the performance of the duties enumerated in this Agreement and as may be requested by Corporation in connection with Corporation's business.

Rypac argues that the Coakley violated Paragraph 3.b in two different respects. First, Rypac argues that because Coakley devoted some of his time and efforts to his brother's corporation, Rypac N.E ., before October 10, 1997, during which time Coakley was a Rypac employee, director and officer, Coakley's Rypac N.E.-related activities violated paragraph 3(b). Second, Rypac claims that the Officer's Agreement was never validly terminated, and therefore Coakley remained obligated not to compete with Rypac even after his October 10 resignation. Therefore, the plaintiff concludes, all contracts PAC entered into after October 10, 1997 constituted breaches of Paragraph 3.b.

These claims are separately considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 10
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

1. The Rypac N.E. Claim

Beginning in 1993 or 1994, Coakley sold machinery through his brother Donald's company Rypac N.E., to generate additional income for the purpose of funding a second retirement account. [FN63] Coakley contends that these sales were not competitive with Rypac, because Rypac N.E. provided lines of equipment that Rypac did not sell, [FN64] and also because Coakley typically spent over sixty hours per week on Rypac business. Coakley also argues that because Poges acquiesced in his Rypac N.E. activities, Poges cannot now be heard to complain of them.

FN63. TR Coakley 274-75.

FN64. TR Coakley 274.

The record shows that Coakley did discuss his involvement in Rypac N.E. with Poges, and Poges told him that it was not a problem. [FN65] At trial, Poges did not deny that he and Coakley had that discussion, and admitted he could not recall ever objecting to Coakley's activities with Rypac N.E. [FN66] As Rypac's only officers, directors and shareholders, Poges and Coakley also had the power to amend or waive any restriction imposed by the Officer's Agreement. Accordingly, I find that Poges orally waived Paragraph 3(b) with respect to Coakley's activities on behalf of Rypac N.E.

FN65. TR Coakley 275-76. Coakley testified that after Paul Osborne and Bob Wischhusen mentioned that they had a meeting with Poges and that Poges was unhappy with Rypac N.E. and activities with Rypac N.E ., Coakley confronted him. Coakley testified: "when I saw Joe the next time-and it was with Bob and Paul-I asked him if he had any problems. And Joe said that I had no problems." *Id.* at 276.

FN66. TR Poges 114-15.

But, even if it is assumed that Coakley's activities with Rypac N .E. violated Paragraph 3(b), Rypac suffered no resulting harm. Coakley regularly devoted over 60 hours weekly to Rypac. Indeed, Poges held Coakley out as an exemplary employee and model for others to mold their work habits. [FN67] Moreover, Rypac N.E. did not compete with Rypac, because Rypac N.E. sold only machinery that was unavailable through Rypac. For these reasons, the Rypac N.E. claim lacks merit and must be rejected.

FN67. TR Coakley 105-106.

2. The Officers Agreement Claim

Rypac's second claim is that Coakley's competitive activity violated the Officer's Agreement because that Agreement (and its "non competition" provision) remained in effect after October 10, 1997. This argument rests upon Rypac's reading of Paragraph 7 of the Officer's Agreement, which provides that the Agreement "shall be terminated upon purchase of the Officer's stock in the Corporation pursuant to paragraph 4 through 7 of the Shareholder's Agreement." [FN68] Rypac argues that this provision means that the Officer's Agreement could not be terminated until Coakley " agreed to surrender his Rypac stock pursuant to the buy-back provisions of the Stockholder Agreement," which did not occur until the end of August 1998. [FN69]

FN68. PX 30.

FN69. Plaintiff's Op. Br. 14.

*8 This argument also lacks merit. Paragraph 7 does not state that it is the *only* method by which the Officers Agreement may be terminated. Rather, that paragraph essentially provides for a stock buy-back if the Agreement is terminated, and is intended to ensure that the Agreement will terminate if an officer sells his Rypac stock to the other stockholder. Paragraph 7 does *not* preclude a termination of the Agreement in any other manner permitted by Delaware law. [FN70]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 11
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

FN70. *See Artesian Water Co. v. State,* Del.Supr., 330 A.2d 441, 443 (1974).

In this case, Coakley implicitly terminated the Officer's Agreement when he resigned from Rypac on October 10, 1997. The first paragraph of the two-page Agreement provides:
Officer shall be employed by Corporation as President, and as salesperson with such duties as may be determined and assigned to him by unanimous vote of the Board of Directors. [FN71]

FN71. PX 30, ¶ 1.

I read that paragraph to require that for the Officer's Agreement to remain in effect, the officer must be employed by Rypac as President and as a salesperson. Coakley ceased to satisfy these requirements when he resigned on October 10, 1997. Therefore, I find that by resigning, Coakley also implicitly terminated the Officers Agreement, because at that point he no longer occupied the positions that formed the premise for the Officers Agreement's applicability.

Poges' behavior from and after the date Coakley resigned was consistent with this understanding. The Officer's Agreement provided that Rypac "shall provide health insurance coverage for [officer] and all family members," [FN72] yet Rypac terminated Coakley's insurance coverage after October 10. In addition, on November 17, 1997, Poges sent Coakley a letter that stated, "[t]his letter also serves as a notice of termination of the Officers [sic] Agreement by and between Rypac and you." [FN73] Poges' actions after Coakley's resignation demonstrate that he thought the Agreement was no longer in effect once Coakley resigned.

FN72. PX 30, ¶ 5(a).

FN73. DX 2.

Because the Officer's Agreement was no longer effective after October 10, 1997, the breach-of-Officer's-Agreement claim must be rejected.

C. The Unfair Competition Claim

Rypac next claims that Coakley engaged in unfair competition with it by (a) diverting Rypac commission checks to himself, (b) inducing a manufacturer not to pay Rypac because of a debt Rypac N.E. owed the manufacturer, and (c) using confidential business information to make sales in competition with Rypac.

The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm. [FN74] Each of the plaintiffs' unfair competition claims is evaluated in light of these elements.

FN74. *International Business Machines Corp. v Comdisco, Inc.,* Del.Super., C.A. No. 91-C-07-199, Goldstein, J., Mem. Op. at 20, ( June 30, 1993).

1. The Claim That Coakley Wrongfully Diverted Rypac Checks and Induced a Manufacturer Not To Pay Rypac.

Coakley admits that he advised certain manufacturers to send commission checks directly to him instead of to Rypac. [FN75] Coakley also admits that he attempted to offset debts that Rypac N.E. owed the manufacturer by the amount of commissions owed to Rypac and for which Coakley was responsible. [FN76] Coakley explained these as attempts on his part to assure that Rypac's former sales agents would be paid the commissions Rypac owed them. Coakley stated that he intended to deposit all funds received into a bank account under the name of Rypac, to be distributed from that account in the manner that Rypac historically employed. [FN77] Finally, Coakley testified that when he took these actions he was not advised by legal counsel, and that his conduct was in reaction to Poges' unresponsiveness.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Page 12
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

FN75. TR Coakley 297-302, 335-36.

FN76. TR Coakley 231-32.

FN77. *Id.*

*9 I conclude that Coakley is not liable on a theory of unfair competition because his competitive activity against Rypac was not "unfair." To express it differently, once Coakley resigned from Rypac he was free to compete with it, because (i) the principals had lawfully terminated their contracts with Rypac, and (ii) Coakley had done nothing "wrongful" by persuading the principals to terminate their contracts with Rypac and to enter into new contractual relationships with Coakley and PAC.

Although Coakley is not liable on unfair competition grounds, he is liable in contract for diverting commissions properly owed to Rypac. Despite Coakley's efforts to excuse his conduct, Coakley's diversions of Rypac checks to himself, and his inducing a manufacturer to offset the amount it owed to Rypac by the amount Coakley owed the manufacturer, were wrongful.

Under the Officer's Agreement, (as informally amended by the parties) each officer would receive 75% of the gross commission payments, Rypac would receive 15% and 10% would go to fund Coakley's and Poges' individual retirement accounts. [FN78] To the extent Rypac has not yet received the commission it is owed, Coakley remains liable for that commission. Accordingly, Rypac is entitled to its 15% share of (a) the commission checks that Coakley wrongfully diverted from Rypac, and (b) the commission that Coakley induced the manufacturer not to pay Rypac. [FN79]

FN78. TR Poges 16-18.

FN79. Coakley, Osborne, and Wischhusen are liable to Rypac for the percentage of the commission they respectively owe to Rypac, 15% in the case of Coakley and 10% in the case of Osborne and Wischhusen, as follows:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.