Not Reported in A.2d                                                                                         Page 13
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

| | |
|---|---|
| 1. Dan Coakley | $29,336.70 |
| 2. Paul Osborne | $17,330.30 |
| 3. Bob Wischhusen | $ 9,967.50 |

This represents the $19,438 and $4,800 deposits in the Connecticut bank (TR Poges 53; PX 44); and a $5,098.70 Rypac check that Coakley gave his brother to cash. PX 43. Ex. 15-17; TR Osborne 373-75. PX 9.

*Fournier,* Del. Ch., C.A. No. 13003, Mem. Op. at 7, Jacobs, V.C. (Feb. 28, 1994).

#### 2. The Confidential Information Claim

The plaintiff also claims that Coakley unfairly competed with Rypac because by virtue of his former employment relationship, Coakley had knowledge of the identities and requirements of Rypac's customers and used those "trade secrets" to solicit Rypac's customers. I disagree.

Delaware case law provides that in the absence of a covenant not to compete:
[A]n employee who achieves technical expertise or general knowledge while in the employ of another may thereafter use that knowledge in competition with his former employer, so long as he does not use or disclose protected trade secrets in the process. FN80

Under this test the plaintiff's claim fails, because Rypac did not take reasonable measures to protect the secrecy of the contested information. Rypac's own Internet web page disclosed the identities of many of its customers, Rypac made no effort to maintain the secrecy of that information, and it never told its employees that the identities and requirements of its customers was confidential. Rypac's employees never signed confidentiality agreements covering that information, nor did Rypac ever create guidelines or procedures to protect the information.

*10 Accordingly, the plaintiff has failed to establish its unfair competition claim.

#### D. The Claim of Interference With a Prospective Contractual Relationship

The plaintiff next claims that the defendants tortiously interfered with prospective contractual relationships. The elements of this tort are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference that induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted. FN83

FN80. *Wilmington Trust Co. v. Consistent Asset Management Co. Inc.,* Del. Ch., C.A. No. 8867, Allen, C., Mem. Op. at 7 (March 25, 1987).

Thus, to succeed on this claim, the plaintiff must show that the information constituted a "trade secret." FN81 Information rises to the level of a "trade secret" if it derives independent economic value from not being generally known or readily ascertainable by other persons, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. FN82

FN81. *Id.*

FN82. *Marsico v. Cole,* Del. Ch., C.A. No. 13104, Mem. Op. at 4, Chandler, V.C. (Aug. 15, 1995), *Interim Health Care v.*

FN83. *Bowl-Mor Co. Inc. v. Brunswick Corp.,* Del. Ch., 297 A.2d 61, 64, appeal dismissed, Del.Supr., 297 A.2d 67 (1972); *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* Del. Ch., 532 A.2d 983, 992 (1987).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 14

Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

Plaintiff's tortious interference claims fails because: (1) given the nature of this particular market, the plaintiff cannot claim to have an "expectancy" of a continuous business relationship with its principals, and (2) in any event, the plaintiff has not shown that it suffered any damages as a result of the defendants' conduct. As previously discussed, given Rypac's internal structure and role in the packaging industry, there is no basis to find that Rypac had a valid expectancy of a continued exclusive relationship with its principals. In this industry, " exclusive" contracts are terminable on relatively short notice, and that is what occurred here. Nor did Rypac suffer economic harm, because it was a "pass through" entity-it never made or retained any profit from sales negotiated by its representatives.

### IV. THE COUNTERCLAIM

Coakley and the Intervening Defendants have counterclaimed for the unpaid commissions owed to them. These include commissions placed into escrow, [FN84] as well as commissions yet to be paid by manufacturers. [FN85] In addition, Coakley and the Intervening Defendants claim entitlement to liquidated damages and attorneys' fees under the Delaware Wage Payment and Collection Act (the " Wage Act"). [FN86]

> FN84. By Stipulation and Order entered March 3, 1998 the parties agreed to establish an escrow account and to deposit in that account pending the outcome of this litigation (1) funds received by Coakley between October 10, 1997 through December 22, 1997, and (2) funds received by Rypac and Poges attributable to sales made by Coakley and the other sales representatives. Coakley and the Intervening Defendants now seek the latter funds.

> FN85. The record does not show the precise amounts owed to Coakley and each subagent. The record only contains photocopies of checks for commissions that were deposited into the escrow account, without explaining what portion is owed to which subagent or accounting for tax withholdings.

> FN86. 19 *Del. C.* §§ 1101-1115.

Poges claims that all commissions earned by Coakley and the other subagents while they were employees of Rypac should be awarded to him as damages for Coakley's usurpations of corporate opportunities. Because Poges has failed to establish that the contracts were "corporate opportunities" of Rypac, that argument fails for lack of a valid premise. Accordingly, the plaintiff is liable to Coakley and his subagents, including the Intervening Defendants, as a matter of contract, for all commissions owed to those parties, subject to a set-off equal to the amounts that Coakley owed Rypac for wrongfully diverting and cashing Rypac commission checks.

That ruling does not dispose of all counterclaim issues, however, because Poges also contends, on various grounds, that he is not liable for certain specific commissions addressed in Part IV(A), *infra.* Moreover, Coakley and the Intervening Defendants have counterclaimed for liquidated damages, costs and attorneys' fees under the Delaware Wage Act. If that statutory claim is valid, Rypac and Poges would be liable for double the commission owed to persons who were "employees" under the Wage Act. Poges contends that (i) Coakley and the Intervening Defendants are not entitled to those statutory liquidated damages, because they were not Rypac "employees," and (ii) even if they were " employees," Rypac is not liable for the statutory penalties because it had "reasonable grounds for dispute." [FN87] The Wage Act claim is addressed in Part B, *infra.*

> FN87. 19 *Del. C.* § 1103(b).

### A. The Four Disputed Commissions

*11 I first address the four disputed commission claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                          Page 15
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

### 1. *The Hi-Speed Commission*

The Intervening Defendants, while acting as subagents for Rypac on behalf of Hi-Speed, a manufacturer, earned a commission that Hi-Speed withheld from Rypac as a set off against a debt owed by Rypac N.E. (Donald Coakley's company owed the manufacturer). The parties agree that Wischhusen is owed $17,971.24, and that Osborne is owed $3,432.00, of the total commission generated by that transaction. [FN88] The Intervenors request, and I will enter an order directing, that if and when Hi-Speed pays those commissions to Rypac, Rypac shall pay those amounts to Wischhusen and Osborne.

FN88. Stipulation Regarding Damages of Intervening Defendants ¶ 4.

### 2. *The EDL Commission*

Rypac and Wischhusen have stipulated that in 1996 Wischhusen earned a commission that the manufacturer paid to Rypac, [FN89] and that Rypac then mistakenly paid that commission to Coakley. Wischhusen's claim for that commission is valid, and Rypac will be ordered to pay Wischhusen the $5,589.81 amount. Because it was Rypac that erroneously paid the commission to Coakley, Rypac may assert any claim it may have for reimbursement directly against Coakley.

FN89. IDX 19; TR Poges 181.

### 3. *The Serpa Packaging Commission*

Coakley contends that he earned a commission from Serpa Packaging. Poges responds that that commission was paid. The dispute arises out of the sale of a cartoning machine on behalf of Serpa Packaging Solutions to 8-in-1 Pet Products. [FN90] The parties agree that Rypac was paid a $2,625 commission on this sale. [FN91]

FN90. TR Coakley 305-306; DX 75.

FN91. TR Coakley 305-306; DX 75; TR Poges 458-59.

Initially Poges refused to pay Coakley, because Poges claimed that the machine had been returned. Poges later admitted that he was mistaken after Coakley testified that he had seen the machine at 8-in-1 Pet on recent visits to its facility. [FN92] Poges then claimed that the commission was paid to Rypac's account and had been "credited" to Coakley, but Poges could not produce any document or other evidence that Coakley had been paid the commission. [FN93] I find that Rypac owes Coakley the $2,625 commission.

FN92. TR Coakley 305-306; TR Poges 457-58.

FN93. TR Poges 457-58.

### 4. *The SASIB Commission*

Wischhusen contends that Poges wrongfully sold a machine in Wischhusen's territory without telling Wischhusen, and that as a result, Wischhusen is entitled to 90% of the resulting $18,000 SASIB commission (the sales representative's share). The parties have stipulated that the SASIB commission resulted from the shipment of a machine to a customer located in Wischhusen's sales territory, and that Wischhusen is entitled to some percentage of the commission. The dispute is over how much.

In this industry, the commission earned by a sales representative (here Poges) who sells a machine in another sales representative's (here Wischhusen's) territory is payable in one of three different ways. First, if the seller representative has "poached" in another sales representative's exclusive territory, the sales representative who is assigned the territory where the sale is made is entitled to receive the full sales representative's share of the commission, on the basis that the sale should have been made by the rightful sales representative. "Poaching" occurs where a sales representative obtains an order from a customer in another sales representative's protected territory, and then receives the commission generated by that sale. [FN94]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 16

Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

FN94. TR Wischhusen 436.

*12 Second, if the sale is a "ship-in," the representative who actually makes the sale (even if it occurs in another representative's exclusive territory) receives most of the commission, and the sales representative who has the territory receives only a nominal portion. A "ship in" occurs when the seller receives a lead from a source outside of the territory, all of the sales work for a machine is done outside the territory, and the machine is then shipped into another territory.

Third, if the seller notifies the sales representative who works the territory where the sale is to occur, and the two representatives work together, then each sales representative receives 50% of the sales representative's share of the commission. [FN95]

FN95. TR Wischhusen 441-42.

In this case, Poges' actions amounted to poaching. Poges testified that he made a routine call to National Industrial Products in Wischhusen's territory a few weeks before negotiating the sales contract. Because there is no evidence that Poges acted upon a lead, it must be inferred that there was no lead, and that the sale was generated by Poges' admitted routine sales call to a customer in another agent's territory. [FN96]

FN96. Mr. Poges testified that he received a lead from Falcon Safety Products, but the only evidence mentioning that company is dated June 13, 1997, a full year after the original proposal resulting in the sale took place. IDX 23. Moreover, in discovery Poges turned over Intervening Defendants' Exhibit Nos. 23 through 36, but neither exhibit evidenced a "lead" from Falcon Safety Products. Nor was any evidence produced that most of the work was completed outside of Wischhusen's territory.

Even if Poges did act on a legitimate lead, he should have notified Wischhusen of any lead he received in Wischhusen's territory. At that point Wischhusen would have pursued the lead himself, or he and Poges would have split up the work. Poges never informed Wischhusen, who learned of the sale only while making a call on the customer, and while there, observed a brand-new piece of machinery. Wischhusen asked the customer's president where he purchased the machine. The president told him he had purchased it from Joe Poges of Rypac. [FN97]

FN97. TR Wischhusen at 437.

Poges' testimony that "it just never clicked" that the sale was taking place inside Wischhusen's territory is simply not credible. [FN98] Rypac's territories were assigned geographically. Poges knew that, because he printed brochures designating how these territories were assigned. [FN99] Wischhusen's territory was Pennsylvania and Camden, New Jersey, which included zip codes "080" and "081." The proposal (and other documents) contained the address with that zip code, documenting that the customer was in Wischhusen's territory. [FN100] The fact that those documents contained the address and zip code of the buyer, coupled with the fact that Poges physically visited the seller on at least one occasion, persuade me that Poges must have known that the sale was being made in Wischhusen's territory.

FN98. TR Poges 193.

FN99. TR Poges 186-87.

FN100. IDX 23; TR Poges 192.

Thus, Poges engaged in poaching by making a routine sales call to a customer in another sales representative's territory and by making a sale to that customer without informing the sales representative specifically assigned to that territory. Wischhusen is therefore entitled to $16,200, the full 90% of the $18,000 commission he would have made on the sale.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 17
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

B. The Statutory Claim

I now turn to the counterclaim for liquidated damages, costs and attorneys' fees. Under the Wage Act, Coakley and the Intervening Defendants would be entitled to recover the commissions owed plus liquidated damages if: (i) Coakley and his subagents were "employees" of Rypac under 19 *Del. C.* § 1101(a)(4), *and* (ii) if Poges did not have any reasonable grounds for withholding the commissions. Those are the issues posed by the Wage Act counterclaim.

1. The "Employee" Issue

***13** The Wage Act was enacted by the General Assembly to provide for payment of wages and to enforce their collection. [FN101] Under 19 *Del. C.* § 1101(a)(4), an "employee" is "any person suffered or permitted to work by an employer under a contract of employment either made in Delaware or to be performed wholly or partly therein." The legislative intent was to have the courts decide, on a case-by-case basis, whether a person is an employee for the purposes of the Act. [FN102]

>    FN101. *State of Delaware v. Planet Insurance Co.,* Del.Super., 321 A.2d 128, 133 (1974).
>
>    FN102. *Fairfield Builders, Inc. v. Vattilana,* Del. Sup., 304 A.2d 58, 60 (1973).

In *Fairfield Builders Inc. v. Vattilana,* the Supreme Court articulated three criteria to guide that determination: (1) whether the employer retained control over the means and methods of doing the work, (2) whether the person was taxed like an employee, and (3) whether other benefits consistent with a standard employment contract were provided. [FN103]

>    FN103. *Id.*

The issue is whether Osborne, Wischhusen, and Daniel Coakley were Rypac employees under the Wage Act. Although Osborne and Wischhusen never signed the document, their Subagent Agreement provides that they were "independent private contractor[s] and [are] not employee[s] of Rypac Packaging Machinery Incorporated, as ... independent contractor[s][are] responsible for [their] own operating expenses." [FN104] By its terms, the Subagent Agreement (i) required that they fund their own retirement accounts, [FN105] (ii) stated that they would not receive any employee benefits from Rypac, [FN106] and (iii) provided that they would not be taxed as employees. [FN107] Osborne and Wischhusen testified that the only reason they did not sign the Subagent Agreement was that they objected to its non-compete clause, not because they disagreed with its other provisions. That evidence leads me to conclude that Osborne and Wischhusen orally agreed that Osborne and Wischhusen would not be employees for purposes of the Wage Act or any other purpose.

>    FN104. PX 2 and 11, ¶ 1.
>
>    FN105. *Id.* at ¶ 16.
>
>    FN106. *Id.* at ¶ 20.
>
>    FN107. *Id.* at ¶ 18. (Providing that Rypac would issue a 1099 miscellaneous tax form to Osborne and Wischhusen every year, which is a form issued for commission owed to non-employees for services.)

Daniel Coakley, however, was an employee under the Wage Act. He signed an Employment Agreement with Rypac, which expressly provides that Daniel Coakley was an employee of Rypac." [FN108] His Employment Agreement provided that 15% of his sales commission would be allocated to his retirement plan. Although the Employment plan did not describe any health plan, the Officer's Agreement did.

>    FN108. PX 22.

2. Reasonable Grounds to Dispute Payment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 18

Not Reported in A.2d, 2000 WL 567895 (Del.Ch.), 26 Del. J. Corp. L. 666
**(Cite as: Not Reported in A.2d)**

Having determined that Daniel Coakley was a Rypac employee, I turn to the next issue: whether at the time it failed to pay the commissions, Rypac had any reasonable grounds to dispute its claimed obligation to pay those commissions. Section 1103(b) pertinently provides:

"If an employer, without any reasonable grounds for dispute, fails to pay an employee wages, as required under this chapter, the employer shall, in addition, be liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day... or in an amount equal to the unpaid wages, whichever is smaller."

Thus, the employee's right to recover liquidated damages for improperly withheld wages depends upon whether the employer had "reasonable grounds for dispute." Rypac argues that the pendency of this lawsuit establishes the requisite "reasonable grounds for disput[ing]" what Daniel Coakley claimed was owed.

*14 I find that Rypac is not liable for the statutory doubling penalty, [FN109] because it had "reasonable grounds [to] dispute" the commission claim. Those grounds consisted of Rypac's belief that Coakley had breached his fiduciary duties to Rypac by having wrongfully cashed commission checks, and directing third parties not to pay Rypac. On that basis, I conclude that Coakley's statutory claim for liquidated damages under the statute lacks merit.

FN109. *Peirson v. Hollingsworth,* Del.Super., 251 A.2d 350 (1969).

Accordingly, the counterclaim shall be dismissed.

### V. CONCLUSION

Counsel shall promptly confer and submit an appropriate form of order implementing the rulings made herein.

Del.Ch.,2000.
Rypac Packaging Machinery Inc. v. Coakley
Not Reported in A.2d, 2000 WL 567895 (Del.Ch.),

26 Del. J. Corp. L. 666

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                                                  Page 1

Not Reported in A.2d, 1987 WL 14626 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

C
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
In re Application of MOTIVATIONAL CENTER, INC.
Submitted: Oct. 19, 1987.
Decided: Nov. 3, 1987.

Motivational Center, Inc., pro se.

MEMORANDUM OPINION

ALLEN, Chancellor.
*1 The question presented is whether plaintiff may proceed *in forma pauperis.* The putative plaintiff is Motivational Center, Inc., a Delaware corporation. It has filed a paper denominated a Motion for Injunction. The gist of the "motion" is that the corporation was "deeded" property located at 800 West Ninth Street in the City of Wilmington; that the City "made certain statements ... questioning ownership of [such] property ... without probable cause" and "as a result [has] interfered with [plaintiff's] unrestricted ... enjoyment of [such] property." There is no allegation that such statements as allegedly were made by the City were false, that such statements were made with malice or of the specific effect such statements allegedly had or how those effects have caused damage.

The "motion" is accompanied by a paper termed an affidavit which has been submitted in support of a request that the "motion" be permitted to be filed without payment of the $60 fee required by Rule 3 for the commencement of an action in this court.

For the reasons that follow, I will decline to order that these papers be filed without payment of the required filing fee.

Delaware has no statute such as Section 1915 of Title 28 of the United States Code requiring that civil actions be entertained without the payment of filing fees when the plaintiff establishes by affidavit that he or she is impecunious. Nor is this, assuming the allegations of the motion to be true, the kind of case in which the Constitution of the United States requires that the case be heard without regard to ability to pay a modest filing fee. *Compare, Boddie v. Connecticut,* 401 U.S. 371 (1971) *with United States v. Kras,* 409 U.S. 434 (1973) *and Ortwein v. Schwab,* 410 U.S. 656 (1973). Nevertheless, no statute of Delaware limits the court's ability to waive filing fees, at least for residents of the state, (*compare* 10 *Del.C.* § 3102: payment of costs by non-residents for issuance of process non-waivable) and in a proper case, this court may do so under its common law powers. *See* Statutes 11 Hen. VII Ch. 12 and 23 Hen. VIII Ch. 15; *Makin v. Mack,* Del.Ch., 336 A.2d 230, 234 (1975) (English common law, when not altered by statute, continues as part of Delaware law).

This power, however, ought to be cautiously exercised. The filing fee required by Rule 3 is very modest and represents only a small, partial underwriting of the costs that are necessarily incurred in providing a dispute-resolution mechanism. Perhaps equally as important as such fees' cost-defraying function is the fact that they tend to evidence a seriousness of purpose by requiring a citizen to contribute something, however modest, to the cost of the process. Overutilization of scarce judicial resources may, at least minimally, thus be avoided. Justice should not be rationed out only to those who can afford to pay; but neither is legal justice a thing that can be produced without effort and social cost. Reasonable and modest filing fees recognize both of these facts. [FN1]

*2 In deciding to waive this requirement in an appropriate case, the court exercises discretion that has two points of focus. First, the court should be satisfied that the plaintiff is in fact impecunious; that is, that he or she will, as a practical matter, be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 2
Not Reported in A.2d, 1987 WL 14626 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

unable to litigate the claim asserted if the filing fee is not waived. This aspect of the matter should be addressed by plaintiff's affidavit in sufficient detail to permit a knowledgeable judgment to be made. Second, the court must assess the allegations of the complaint to assure itself that, assuming the facts alleged to be true, a substantial claim is asserted and that the matter pressed is not frivolous or vexatious.

The pending application fails on both counts, in my opinion. As to the affidavit, it is defective in a number of critical respects. First, while it recites that its maker has been duly sworn, it is not notarized. Second, it is "signed" by two individuals on behalf of plaintiff but each signature appears to be in the same handwriting. Third, and most important, it is purely conclusory, stating no facts from which one could conclude that Motivation Center, Inc. has no ability to raise $60.
If that company does own property, as the complaint alleges, it is hard to imagine that it cannot raise from its stockholders or members or from creditors the small sum involved. Fourth, it is unclear what it means in any case since it repeatedly uses the pronoun "I". FN2

As to the complaint, it does not appear to allege a wrong; if a cognizable legal wrong has occurred, it is not disclosed by the short pleadings summarized above. The paper comes closest to alleging a cause of action for slander of title. The elements of such an action include the (1) malicious (2) publication of (3) false matter concerning the state of title of property which (4) causes special damages. *See* 50 Am.Jur.2d *Libel and Slander* § 541. Here there is no allegation of malice, nor of falsity nor of special damages. Ordinarily, a well-pleaded complaint for damages arising from such slander would be entertained in the Superior Court. While the paper presented also contains a request for an injunction against further disparagement, to be effective to confer jurisdiction on this court, standing alone, a prayer for an injunction must be premised upon more than the past occurrence of a wrong, but upon factual allegations that provide a reasonable basis to apprehend fear of future repetitions unless an injunction is granted. *See McMahon v. New Castle Associates,* Del.Ch., --- A.2d ---- (C.A. No. 8707, Allen, C. (August 21, 1987)).

Concluding, therefore, that the present application satisfies neither aspect of the applicable test, I will order that the original papers not be filed without payment of the filing fee fixed by Rule 3 and that they be returned to the corporation.

> FN1. Our Constitution itself guards against the threat that filing fees may be increased beyond what is reasonable in the circumstances. *See* Art. 1, Section 9.
>
> FN2. I leave for another time the question whether a corporation, rather than a living person, can ever qualify for the special dispensation of *in forma pauperis* status.
> There is reason to think that a corporation-a legal fiction that represents the claims of various interests-ought not to qualify for such dispensation, at least unless it shows that its shareholders or members are also unable to capitalize the firm to the necessary extent and no other source of funds is available. But, this point may be passed over for now. I also leave unaddressed any question concerning a corporation's ability to appear *pro se.*
> These matters may be addressed later, if necessary.

Del.Ch.,1987.
Application of Motivational Center, Inc.
Not Reported in A.2d, 1987 WL 14626 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.